564 F.2d 388
 Bobby BATTLE, Plaintiff-Appellee,
v.
Park J. ANDERSON, Warden, Oklahoma State Penitentiary, Leo
McCracken, Director, Department of Corrections, State of
Oklahoma, Roy Sprinkler, Deputy Director of Institutions,
Sam C. Johnston, Deputy Warden, Oklahoma State Penitentiary,
Captain Black, Correctional Officer, Danny Nace,
Correctional Officer, Otis P. Campbell, Correctional
Officer, Oklahoma State Penitentiary, Defendants- Appellants,
United States of America, Intervenor.
 No. 77-1554.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Aug. 23, 1977.
Decided Oct. 26, 1977.
Rehearing Denied Nov. 22, 1977.
 
 Larry Derryberry, Atty. Gen. of Oklahoma, Oklahoma City, Okl. (Paul Crowe and Amalija J. Hodgins, Asst. Attys. Gen., Oklahoma City, Okl., on the brief), for defendants-appellants.
 Dennis J. Dimsey, Washington, D.C. (Drew S. Days, III, Asst. Atty. Gen., and Frank D. Allen, Jr., Dept. of Justice, Washington, D.C., Richard A. Pyle, U.S. Atty., Muskogee, Okl., on the brief), for intervenor.
 Louis W. Bullock, Stillwater, Okl. (Bullock & Hornbostel, Stillwater, Okl., American Civ. Liberties Union of Oklahoma, on the brief), for plaintiff-appellee.
 Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Appellants, defendants below, hereinafter referred to as State of Oklahoma, appeal from an Order of the United States District Court dated and filed June 14, 1977, directing the State of Oklahoma to achieve specific inmate population reductions at two state penal facilities, i. e., the Oklahoma State Penitentiary at McAlester, Oklahoma, and the Oklahoma State Reformatory at Granite, Oklahoma. The State of Oklahoma, following its filing of its Notice of Appeal, moved this court for a stay of the Order of June 14, 1977, which was granted and is yet in force and effect. The appeal and motion for stay were combined for hearing before this court which was held on August 23, 1977. The Stay Order has been continued pending disposition of the appeal on the merits.
 
 
 2
 The genesis of the District Court's Order of June 14, 1977, is a Motion for Emergency Supplemental Relief filed by plaintiff Bobby Battle wherein he alleged "overcrowding" of the inmate population at the state penitentiary. The challenged Order was entered following full evidentiary hearing. It contains specific findings, inter alia, relative to the minimum amount of cell space required per prison inmate and, measured thereby, the District Court specially found that as of the May 23 hearing the Oklahoma prison system contained about 4,600 inmates in a system designed for 2,400, constituting an overcrowding situation of 191 percent. In addition to the overcrowding crisis, the Court found various and sundry physical and environmental conditions existing throughout the system which were offensive and substandard. The Court specially found that the overcrowding condition had reached such proportions that it constituted a per se unconstitutional condition violative of the Eighth Amendment commands prohibiting cruel and unusual punishment. The Order and Judgment required the State of Oklahoma to achieve specific goals in the reduction of inmate population commencing August, 1977, more fully hereinafter set forth.
 
 
 3
 On appeal, the appellant, State of Oklahoma, alleges error on the part of the District Court in that: (1) the evidence does not support a finding that there is a violation of the Eighth Amendment to the United States Constitution, (2) appellants were denied a fair hearing, (3) findings of fact were erroneously made because the trial court was misled and unduly swayed by the consideration of inadmissible exhibits and, further, because the facts were for the most part unsubstantiated by competent testimony of the witnesses, and (4) the court should have accepted the State's Plan as consented per agreement reached between the State and the appellees.
 
 
 4
 The seriousness of this matter is recognized by all parties concerned. This court, just as the trial court, is cognizant of the strain placed upon the federal-state relationship. We echo the consistent emphasis of the District Court relating to its reluctance to usurp or interfere with an area historically within the domain and control of the sovereign states. It is in this context that we must judge whether, from the record before us, there exists such a compelling interest in the protection of federal constitutional rights that the Order of the District Court must be upheld. A somewhat detailed recital of the factual-procedural background leading to this opinion should help in placing this difficult case in proper perspective.
 
 
 5
 The initial complaint alleged civil rights deprivations under 42 U.S.C.A. § 1983 challenging the Oklahoma State Penitentiary and penal system. It was filed by Bobby Battle, pro se, on April 24, 1972, when he was a prisoner at the penitentiary. He complained on behalf of himself and other inmates that they were deprived of rights secured by the federal constitution and civil rights laws. The action sought injunctive relief to correct the claimed deprivations and to obtain monetary damages. The defendants were various Oklahoma officials performing duties relating to the state's penal and correctional institutions and system. Upon motion and hearing, the United States was permitted to intervene on March 5, 1974. The complaint in intervention filed by the United States alleged that the defendants (the State of Oklahoma, in effect) had discriminated against black inmates in a number of instances. The trial of said cause commenced March 14, 1974, and concluded on March 15th. It had been preceded by extensive pre-trial discovery including depositions, inspections and investigations conducted by attorneys, FBI agents and experts in penology. The District Court made extensive findings and conclusions leading to its Order, generally finding for the plaintiffs. The Order directed the defendants to undertake certain remedial steps, granting them adequate opportunity within which to comply. Nothing in that proceeding, however, involved the general contention of prison inmate overcrowding, per se. The Court did deal with conditions existing in the "solitary confinement" or "the hole" isolation area of the penitentiary, noting that those confined in such dark, unventilated and unsanitary isolation cells were being subjected to intolerable treatment. The Order also reached and disposed of contentions going to racial discrimination and segregation, disciplinary rules, punishment and procedure, administrative lockup, use of chemical agents, medical care, correspondence rights, publications, access to the courts, and religious freedom. In apparent reliance on the rule that a § 1983 civil rights action in Federal District Court is supplemental to any other available remedy, no challenge to the federal court's jurisdiction has at any time been raised or urged on the grounds of exhaustion of available state remedies or as a matter of abstention. At oral arguments before this court, counsel for the State of Oklahoma did state belief that similar remedies are available to the inmates under the laws of the State of Oklahoma. It was acknowledged, however, that at no time or in anywise was the Federal District Court below moved or requested to invoke abstention or exhaustion of available state remedies. At oral argument, counsel for Bobby Battle, et al., contended that there are no remedies available under the laws of Oklahoma comparable to the class action remedies which may be compelled in a § 1983 proceeding. In any event, it is clear that the parties have acceded to the District Court's jurisdiction throughout these proceedings.
 
 
 6
 The District Court expressed the reluctance of federal courts to intervene in matters of prison administration, but observed that the United States Supreme Court had held that a policy of judicial restraint on the part of the federal courts in refraining from interference with state penal authorities in their administration of a state's penal system was not a justifiable basis for failure to take cognizance of valid federal constitutional claims relating to rights secured to inmates by the federal constitution and the laws of the United States. Procunier v. Martinez, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The District Court retained jurisdiction, including that for "determination of all issues not dealt with expressly herein." The trial court's memorandum opinion consumed 30 pages, reported as Battle v. Anderson, 376 F.Supp. 402 (1974).
 
 
 7
 We, too, abhor any situation or circumstance requiring the intervention of the federal courts in matters involving the administration, control and maintenance by the sovereign states of their penal systems. It is a delicate role assigned to the federal courts to display that restraint so necessary "in the maintenance of proper federal-state relations." Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). We are cognizant of the complexity of problems confronting the states in upgrading not only a host of state institutions and facilities but in properly maintaining them both physically and with adequate personnel. If we were to close our eyes to the financial burdens a variety of "piecemeal" federal court orders would impose upon the states and their taxpayers we would refuse to come to grips with reality. We are in sympathy with the ever increasing budgetary demands upon state taxpayers. There are constitutional and statutory limits on a state's capacity to finance capital outlays. No one state governmental body is authorized to dictate a specific course of action. The governmental wheels often turn slowly simply as a result of pressure generated by a multitude of needs. Those charged with the administration of state government must pick and choose, set priorities and goals, many of which must later be abandoned or delayed because of unforeseen emergencies. Thus, it is in recognition of these problems and pressures that this court is sincerely reluctant to enter the arena involving the issues presented. The fact is, however, that the issues are jurisdictionally before us, just as they were jurisdictionally before the District Court. They have not been invited or solicited. We are guided by the fact that the United States Supreme Court has not wavered in its holding that the Eighth Amendment to the United States Constitution prohibiting the imposition of cruel and unusual punishment is, inter alia, intended to protect and safeguard a prison inmate from an environment where degeneration is probable and self-improvement unlikely because of the conditions existing which inflict needless suffering, whether physical or mental. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
 
 
 8
 The District Court made particular reference to a serious riot which occurred at the Oklahoma State Penitentiary in 1973 when it entered its Supplemental Order of June 14, 1977, following Plaintiff's Motion for Supplemental Relief as to Crowding:
 
 
 9
 The conditions which precipitated and caused the disastrous riot of 1973 at McAlester now prevail throughout the system. In the hearings conducted by the court in 1974 prior to its May 30, 1974 Order (376 F.Supp. 402) the court heard the shocking details of the conditions existing prior to the riot and became convinced that the neglect, apathy and deliberate disregard for human decency and rights contributed directly to the tragic loss of lives and $20 million in state property damages. It is now equally convinced that the inmate conditions now existing present an immediate and intolerable threat to the safety and security of inmates, prison personnel and the people of the State of Oklahoma with attendant monetary losses and costs of staggering proportions.
 
 
 10
 In its 1974 opinion in Battle v. Anderson, supra, the District Court noted that during a period of seven months prior to the 1973 riot at the penitentiary the inmate population at the main facility averaged about 1778; that two of the general population cellhouses were constructed in 1907 and the third and fourth units were added in 1932 and 1935, providing a design capacity of 1200 inmates.
 
 
 11
 In its Memorandum Opinion of June 14, 1977, from which this appeal was generated, the Trial Court observed that the State of Oklahoma made significant progress in many of the concerned areas included in the original order, while failing to do so in other areas; that since the May 30, 1974, order the court had conducted periodic hearings at approximately six month intervals; and that evidence concerning the problem of overcrowding and conditions of confinement was entertained and presented on May 4, 1976, and October 14-15, 1976, and that even though the Court did not issue any orders at those times, "it clearly indicated to the defendants that the then existing population levels and conditions were intolerable and that the court was considering the issuance of an injunction" and "In the interim the problem kept going." The court found that as of May 23, 1977, the State of Oklahoma was housing inmates at seven (7) separate facilities totalling 4,600 in facilities with design capacity not in excess of 2,400. Much of this data was obtained from an exhibit constituting a letter from the Director of the Oklahoma Department of Corrections dated March 22, 1977. The court observed that it had deferred since May 30, 1974, from entering specific orders in the hope that the commended vigorous leadership of Warden Crisp and Director Benton would, in effect, move the "powers that be" to correct those abuses, but that the court learned in October, 1976, that even though the State Board of Corrections in its FY78 Budget had labeled conditions within the Department a "shame and disgrace" to the State of Oklahoma, the crisis was still such that the physical and mental health of each inmate was impaired. The court found that each resident living in a cell should have a minimum of 60 square feet of sleeping space and each resident of a dormitory should have 75 square feet, as found by the State Department of Corrections to be the absolute minimum; that certain facilities then in being were woefully inadequate, rendering treatment of inmates there imprisoned cruel and unusual. The Trial Court lent considerable credibility to the expert testimony of Theodore James Gordon, an environmental health specialist, Frederick D. Moyer, an architect, and Charles Robert Sarver, a professor of law and sociology and a former correctional administrator. The court recited in detail the conditions of confinement at each prison facility, i. e., the McAlester complex, Granite, Lexington, Quachita, McLeod and Stringtown. The Court's Conclusions of Law and Order and Judgment of June 14, 1977, are as follows:
 
 CONCLUSION OF LAW
 
 12
 1. The Court has the authority and duty to insure that the Constitution does not stop at the prison gate, but rather inures to the benefit of all, even to those citizens behind prison walls, Jackson v. Godwin, 400 F.2d 529, 532 (5th Cir. 1968), Finney v. Arkansas Board of Education (Correction), 505 F.2d 194 (8th Cir. 1974).
 
 
 13
 2. In implementing the Constitution, courts have required that certain penal facilities be closed, Rhem v. Malcolm, 371 F.Supp. 594 (S.D.N.Y. 1974) aff'd 507 F.2d 333 (2nd Cir. 1974), Gates v. Collier, 390 F.Supp. 482 (N.D.Miss. 1974), and Hamilton v. Landrieu, 351 F.Supp. 549 (E.D.La. 1972); that inmates be housed in single cells, instead of multiple inmates in a cell, Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass. 1973) aff'd, 494 F.2d 1196 (1st Cir. 1974), and Valvano v. Malcolm, 520 F.2d 392 (2nd Cir. 1975) that prison population be limited to a fixed number, e. g., Alberti v. Sheriff of Harris County, 406 F.Supp. 649 (S.D.Tex. 1975); or that inmates be afforded a fixed minimum amount square footage (see cases cited at conclusion of law 6).
 
 
 14
 3. Courts have also evaluated quality of life in penal facilities and demanded a healthy environment with adequate sanitation, ventilation, lighting and utilities, Williams v. Edwards, 547 F.2d 120 (1206) (5th Cir. 1977); regarding ventilation Rhem v. Malcolm, supra, Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark. 1971) and Alberti v. Sheriff of Harris County, supra. Vermin infestations, Miller v. Carson, 401 F.Supp. 835, (M.D.Fla. 1975) and Hamilton v. Landrieu, supra. See also Rozechi v. Gaughan, 459 F.2d 6 (1st Cir. 1970) and Wyatt v. Stickney, 344 F.Supp. 387 (M.D.Ala. 1972) aff'd sub nom. Wyatt v. Aderholt, 523 (503) F.2d 1305 (5th Cir. 1974).
 
 
 15
 4. Courts have grappled with the problems and the conditions of confinement in three ways. Conditions have been found to be per se unconstitutional. E. g., Rhem, supra, conditions as exacerbated by overpopulation have found to be unconstitutional, E. g., Williams v. Edwards, supra, Finney v. Arkansas Board of Corrections, supra, and Pugh v. Locke, 406 F.Supp. 318 (M.D.Ala. 1976). Overcrowding per se has been found to be unconstitutional, Gates v. Collier, supra, McCray v. Sullivan, supra, and Finney v. Arkansas Board of Corrections, supra. This Court finds that all three of these cases are existent within the Oklahoma Department of Corrections.
 
 
 16
 5. In the original Order the Court ordered the closing of certain cells at McAlester. Likewise, the wooden facility at Lexington with its severe environmental and fire hazards shocks the Court's conscience and must be closed upon completion of the new Lexington A & R unit.
 
 
 17
 6. The crowding in Oklahoma has reached such proportions that this Court could easily find, as other courts have, that the crowding is per se unconstitutional. Certainly where prisoners are forced to sleep in garages, barber shops, libraries and stairwells; and where they are placed in dormitories without any toilet and shower facilities the crowding has passed the constitutional threshold. The Court is equally or more offended by the housing of two men within a little 35-40 square foot "cubbyhole". Such crowding offends the contemporary standards of human decency, Trop v. Dulles, 356 U.S. 86, (78 S.Ct. 590, 2 L.Ed.2d 630) (1958).
 
 
 18
 The effects of the crowding as it relates to the conditions of confinement with regard to the health, safety, and security of the inmates is unconstitutional. The crowding has caused the kitchen, water and sewer systems to be overtaxed. The dining facilities, if they were outside the prison walls would be closed down as immediate health dangers. Individuals are housed in substandard living quarters which are firetraps. However, there is no plan or possibility of putting out the fire if a major one occurred.
 
 
 19
 There is a direct correlation between overcrowding and violence, see finding of fact 16, supra. Defendants acknowledge that the 1973 McAlester riot was caused by the then existing overcrowded conditions at the O.S.P. This court would be remiss in its duties if it did not move to act on the problems, but rather sat idly by until the increasing crowding caused another major incident to sweep the Oklahoma Prison system.
 
 
 20
 7. The court adopts the standards of the American Public Health Association for living space and environmental matters. APHA calls for 60 square feet in a cell and 75 square feet in a dormitory. In adopting the APHA 60'/75' standards respectively, the Court is mindful that most other organizations and many of the courts who have faced this problem have adopted higher standards. 6
 
 
 21
 8. In adopting the APHA environmental standards, the Court points out that a prison facility is a closed ecosystem. Persons are sent to prison as punishment, not for punishment. It is incumbent on the incarcerating body to provide the individual with a healthy habilitative environment. Anything less would be to subject the individual to further punishment than was given by the sentencing trial court. With habilitation assured, then possibly or probably the inmate can decide to rehabilitate himself.
 
 
 22
 But if the basic habilitative needs of the individual are not met then rehabilitation, reformation or redemption are not possible. Water, fire protection, air and food are necessities of life. Minimum space to call one's own is a primary psychological necessity. Without the basic minimums prisons are doomed to failure, with both society and the inmates incarcerated therein the losers.
 
 
 23
 9. This Court is well aware of the financial restraints placed on the Defendants and their efforts to comply with the Constitution. But the good will shown by the Defendants cannot serve as a defense. Finney v. Arkansas Board of Correction, supra; Rozechi v. Gaughan, supra; Holt v. Sarver, 309 F.Supp. 362, 385 (E.D.Ark., 1972); and Davis v. Lindsay, 321 F.Supp. 1134, 1139 (S.D.N.Y., 1970). Nor is the lack of financing a defense to a failure to provide minimum constitutional standards. Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968); Finney v. Arkansas Board of Correction, supra at 199; Gates v. Collier, supra, (501 F.2d 1291,) at 1319, 1320 (5th Cir. 1974); Alberti v. Sheriff of Harris County, supra, at 669; and Hamilton v. Love, supra, at 1194. If the State of Oklahoma wishes to hold the inmates in institutions, it must provide the funds to maintain the inmates in a constitutionally permissible manner.
 
 
 24
 10. This Court cannot, on the other hand, allow the Defendants to violate the constitutional rights of the Plaintiffs' class and without acting to alleviate the unconstitutional conditions.
 
 
 25
 Based upon the foregoing reasons of unconstitutional confinement of inmates, the Court deems it necessary to enter the following order to alleviate the unconstitutional treatment of inmates.
 
 ORDER AND JUDGMENT
 
 26
 Defendants are directed to achieve the following goals:
 
 
 27
 (a) Commencing in August, 1977, defendants shall reduce the inmate population at Oklahoma State Penitentiary, McAlester, Oklahoma, at the rate of 100 inmates that month and a like number each succeeding month until the population is reduced to 800 inmates.
 
 
 28
 (b) Commencing in August, 1977, defendants shall reduce the inmate population at the Oklahoma State Reformatory, Granite, Oklahoma, at the rate of 50 inmates that month and a like number each succeeding month until the population is reduced to 450 inmates.
 
 
 29
 (c) The Court does not require the abandonment or discontinued use of any confinement facility at this time, but within 15 months from the date hereof . . .
 
 
 30
 In accordance with the trial court's instructions issued on May 24, 1977, the State of Oklahoma submitted to the court a proposed plan, as follows:
 
 DEFENDANTS' PROPOSED PLAN
 
 31
 Come now the defendants above named and in accordance with the Court's instructions issued on May 24, 1977, submit the following proposed plan:
 
 
 32
 Defendants, admitting no wrongdoing or violation of any inmate's constitutional rights, submit a summary of their ongoing plans to the Court to alter the population concentrations existing within the Oklahoma Department of Corrections. This plan is entered upon with the intent of insuring that no inmate is deprived of his constitutional right. In addition the plan will increase the security within the institutions and to afford the inmates more opportunity for individualized treatment.
 
 
 33
 1. Within a short time, the Department will open a community treatment center in the Oklahoma City area with a capacity of up to 100;
 
 
 34
 2. At the beginning of 1978, the Department will open a 400 person Assessment and Reception Center at Lexington;
 
 
 35
 3. At the beginning of 1978, the Department will establish two additional community treatment center with a capacity of up to 100 for each center, enabling more than half of the prisoners released from the system to undergo several months of work release programming;
 
 
 36
 4. In the spring of 1978, the Department will open another 400 person institution at Lexington;
 
 
 37
 5. In the spring and summer of 1978, the Department will open 450 bed spaces within housing units to be constructed, two at Stringtown, two at Quachita, and one at McLeod;
 
 
 38
 6. Early in 1978, the Department will open a 120 person institution at Sulphur for women;
 
 
 39
 7. Immediate implementation of new procedures for parole docketing and new criteria for parole consideration will enable a larger number of qualified inmates to see the Pardon and Parole Board.
 
 
 40
 8. The Department will continue their plan to upgrade utilities in the prison system. This plan will be accelerated by a $300,000 appropriation currently under consideration by the Legislature;
 
 
 41
 9. Funds have been appropriated or are committed for new construction and facility acquisition which will result in development of entirely new bed space during the next 18 months as follows:
 
 
 42
 Oklahoma City Community
 Treatment Center -- 100
Two additional community
 treatment centers -- 200
Hodgens housing units -- 150
McLeod housing units -- 100
Stringtown housing units -- 200
Lexington Assessment and
 Reception Center -- 400
Lexington Correctional Center -- 400
Hominy Correctional Center -- 400
Sulphur Women's Facility -- 120
 -----
TOTAL NEW BED SPACE: 2,070
 
 
 43
 10. On or before January 1, 1979, each inmate under the Department of Corrections shall have a minimum of 60 square feet in a room, cell, or dorm. The only exception shall be within the walls at the Penitentiary and the Reformatory where no more than one man will be housed per cell, except in the large cells in the F-cellhouse at the Penitentiary where two inmates will be permitted to occupy each cell.
 
 
 44
 The State of Oklahoma filed a Notice of Appeal from the Trial Court's Order of June 14, 1977, and in conjunction therewith moved the Trial Court for an order staying enforcement of that Order and any further proceedings pending appeal. The motion for stay was denied by the district court on July 5, 1977, after consideration of and detailed recitals directed to the criteria to be considered and treated governing the propriety of a stay order pending an appeal, as follows: (1) whether the appellant has made strong showing that he is likely to prevail on the merits of the appeal, (2) whether the appellant has shown irreparable injury if the stay is not granted, (3) whether a stay will substantially harm the other parties to the litigation, and (4) where the public interests lie. In treating these tests leading to the denial of the Motion for Stay, the Trial Court found:
 
 
 45
 The defendants made certain conclusory allegations in their Application that there is a substantial likelihood that they will prevail on appeal. They cite no cases or other law to show that they have any likelihood of success at all. To put the appeal in proper perspective it is necessary to remember what this appeal is really about. It really does not relate to the merits of the case but only to what relief the Court should afford the plaintiffs' class. Unconstitutional conditions now, and for a long time, have prevailed in the Oklahoma State penal system. This was judicially determined by the Court in its May 30, 1974 Order herein. 376 F.Supp. 402. That Order was not appealed by defendants and is unchallenged today. It is undenied that the overcrowded conditions which were the focus of the May, 1977, hearings amount to cruel and unusual punishment. There is no evidence to the contrary and counsel for the defendants has never seriously argued to the contrary.
 
 
 46
 Since the unconstitutionality of the conditions is undisputed the only real question is how much longer plaintiffs' class must endure their constitutional deprivations. Given the history of the case and the magnitude of the violations this Court believes that it is improbable that any court would conclude that it is arbitrary and capricious to grant immediate relief to the victims who are helpless and who are now suffering the cruel and unusual punishment which is now being imposed by the defendants by virtue of the unconstitutional conditions.
 
 
 47
 In their Application the defendants further claim irreparable harm because the Order allegedly mandates "transfers, paroles, releases, or restrictions by (state) District Judges against confinement of convicted felons, without due regard for the safety of the general public and the employees and officers of the institutions of the State of Oklahoma and the health and well-being of the inmates incarcerated therein." This is an extravagant and unsupported statement. The Court mandated only the reduction in population levels at the two institutions. It did not purport to dictate or mandate the means by which the defendants can accomplish the established goals. Similarly, defendants allege "the Court has adopted a posture of administering the Oklahoma Correctional System in abuse of its constitutional authority and jurisdiction." The Court has only decreed that the overcrowded conditions in the two particular facilities must be eliminated within a prescribed time period. The details and administration of a program are left solely to the discretion of the defendants. The Court is interested in ends and not means so long as they are lawful. Defendant further contends that the Order "will unduly disrupt the orderly operation of the penal institutions of the State of Oklahoma." This presumes that the prolongation of the unconstitutional conditions is essential to the "orderly operation" of the system. The Court rejects the idea that constitutionality is incompatible with orderliness and that a constitutional operation is by definition disorderly. Defendants also raise the fear that the Order may result in the premature release of inmates. This fear should be abandoned. The Order specifically provides that no inmate shall be prematurely released; that the defendant may apply for a release of the timely schedule of depopulation of the two institutions at any time.
 
 
 48
 The Order itself has a built-in safeguard to permit the defendants to avoid any irreparable injury. All that is required of the defendants is that they undertake in August, 1977, and each succeeding month thereafter, in good faith, and with due diligence, an attempt to comply with the schedule in the Order. If they do so, "with all the means and resources available to them," the Court expects and demands no more. If the threat of irreparable injury becomes real rather than speculative, the defendants may apply to the Court for temporary relief and delay. By its terms the Order does not decree the impossible and does protect the free majority. If the defendants will avail themselves, if necessary, of this provision of the Order and make the required showing of impossibility or "demonstrably dangerous" threat, defendants can avoid any irreparable harm. Defendants should not object to being required to demonstrate rather than merely imagine the consequences of implementing the schedule.
 
 
 49
 The third burden which defendants have in order to justify a stay is to show that no substantial harm will come to the other interested parties if the stay is granted. North Central Truck Lines, Inc., v. United States, 384 F.Supp. 1188 (W.D.Mo.1974), aff'd., 420 U.S. 901 (95 S.Ct. 820, 42 L.Ed.2d 832.) The defendants largely ignore this requirement. The evidence of existing environmental health and safety problems in the system is overwhelming. There is no doubt that the overcrowding increases the incident of both infectious communicable diseases (e. g., flu, hepatitis, tuberculosis, etc.,) and stress related diseases (e. g., rashes, asthma, hypertension, etc.). Defendants offer no assurances that in the do-nothing interim requested by them, that inmate fatalities or permanent impairment of the physical and mental health of inmates will not result from these causes. It is a harsh thing to say that the lives and health of inmates must be sacrificed to the administrative convenience of the defendants.
 
 
 50
 Finally, where does the public interest lie? This is never an easy question to resolve. It is especially difficult in this type of case, where the plaintiffs' class are generally a feared and despised class. Frequently the issue is confused by the political posturing of public officials. The Court does not purport to be an oracle, able to foresee the future with a clear vision, but it does know that in July 1973 a public disaster occurred at the Oklahoma State Penitentiary at McAlester. Lives were lost. It cost the public many millions of dollars of property destroyed by fire and the public is still paying a high price for the actions and neglect of defendants' predecessors. From the complex of factors involved, the overriding cause must be ascribed to the inhuman and unconstitutional conditions which then prevailed. This is not to justify the riots, but only to state a fact. Similar conditions now exist. The public interest obviously would be badly served by a repeat of that catastrophe. The risk of a stay is very great. If, however, the Order is properly executed the risk is greatly reduced. The Court has not required or ordered the premature release of any prisoner. The defendants must exercise their expertise and good judgment in the matter of prisoner release. The Court has to believe that in the immediate as well as in the long run the public interest in best served by adherence to the Constitution and the protection of the rights of all helpless human beings.
 
 
 51
 As evidenced by the foregoing analysis the defendants have failed to make a strong showing that success on the merits of the appeal is likely, that unless a stay is granted irreparable harm will result; that no substantial harm will come to the plaintiffs' class; that granting of the stay will do no harm to the public interest. Therefore the Application for Stay should be denied.
 
 
 52
 Thereafter, on July 20, 1977, the State of Oklahoma filed with this court a Motion for Stay, invoking the provisions of Rule 8 of the Fed.Rules of Appellate Proc., 28 U.S.C.A. That Motion was granted and has been subsequently extended and continued to date. The contentions raised in relation thereto are considered by this court as part and parcel of the issues on the merits to be decided on appeal. In the Motion for Stay the State of Oklahoma alleges, inter alia, that (a) the subject order requires the transfer of inmates to less secure institutions within the system, (b) the State of Oklahoma has previously presented the trial court with a plan for accomplishing the orderly reduction in inmate population at certain institutions, increasing the capacity at other institutions as well as purchasing and constructing new facilities, (c) the aforesaid plan or program has been funded and approved by the Governor and the State Legislature of the State of Oklahoma and mutually agreed to by all of the parties, and (d) that if this court fails to stay the Order, the State of Oklahoma must choose between two unacceptable actions: first, order inmates transferred to other institutions which have less security, or operating with greater populations than are desirable, place violent and passive inmates in close association, reduce supervision, increase the likelihood of escape and subject the citizens of Oklahoma to increased danger, or, second, to follow all the recognized practices of accepted penology, protect the lives and rights of employees, inmates and citizens, but to incur the legal contempt of the court. Finally, the State of Oklahoma points out that the movement of inmates necessitates staff transfers, budgetary changes, construction of additional facilities, contracts and bidding procedures which must follow state laws, and numerous other administrative problems which require several months of advanced planning to accomplish, which has, in fact, been considered and incorporated into the State's plan for new institutions, as well as the reduction of inmate population at the Oklahoma State Penitentiary and the Oklahoma State Reformatory. The State of Oklahoma complains that Battle, et al., and the United States, as intervenor, presented "absolutely no evidence concerning medical problems, increased violence level, brutality, use of trustee guards, inadequate food and clothing or an excessive amount of time spent in cells" while acknowledging that "the testimony concerning these critical areas was solicited on cross-examination from the defendants, Director Benton and Warden Crisp." (Brief of Defendants-Appellants, p. 10.) Such does not support the contention that the trial court was without substantial evidence to support its findings. The record indicates otherwise. Nor are we impressed with the State of Oklahoma's contention that the Trial Court denied it a fair hearing or that the court was "misled and unduly swayed" by its consideration of alleged inadmissible exhibits and unsubstantiated facts. As to the "fair hearing" contention, the record establishes that even though proper notice was submitted by the court, the State of Oklahoma did not request a pre-trial conference or any request of the court to obtain a list of witnesses or other matters. (R., Vol. I, pp. 8-11.) While the entire record does indeed reflect that certain hearsay and/or questionable exhibits (from an evidentiary point of view) were presented, there is nothing indicating that they "misled or unduly swayed" the Trial Court or even that the Trial Court in fact relied upon them. We observe that even though the "foundation" challenges to certain exhibits are not without substance, there is no doubt from the record that most of them were in fact documents prepared by agencies and/or departments of the State of Oklahoma. (For example, see Vol. I, pp. 254-265.)
 
 
 53
 We are satisfied that the State of Oklahoma has, since the 1973 disastrous riot, made significant progress in upgrading its penal system. The State contends that the 1974 Oklahoma Legislature appropriated $16,285,090.00 to the penal system, representing an increase of 46.9% over the previous year; that the 1976 Legislature appropriated.$44,000,000.00, an increase of 534% over the 1973 appropriation. There can be no doubt that the State of Oklahoma has, as the District Court acknowledged, made significant strides and efforts to remedy the serious deficiencies. Even so, the Court's finding that the presently existing overcrowding condition at the two facilities, when considered with other circumstances, constitutes cruel and unusual punishment is not clearly erroneous. We hold that there is substantial evidence supporting the finding. It was made, to be sure, notwithstanding the comprehensive Plan prepared and submitted to the Court by the State of Oklahoma and approved by all parties to this litigation. That Plan established a priority goal by the State in the commitment of its fiscal and administrative resources to expeditiously upgrade its entire penal-correctional system. We commend the State of Oklahoma and its people for the actions taken. Even so, we must hold that the Trial Court did not err in its order here challenged. We cannot, on the basis of the record before us, arbitrarily substitute our judgment for that of the resident federal district judge who has given so much of his time, conscience and effort to this on-going case. His concern for the protection of the constitutional rights of the inmates goes to the "heart" of their physical and mental well being. We believe that the Trial Court has endeavored to diligently accommodate the concurrent problems confronting the State of Oklahoma. We agree with the District Court that the exigencies weigh in favor of the inmates.
 
 
 54
 We have carefully considered the State of Oklahoma's request for the additional time required to effectuate its comprehensive Plan which the State deems necessary in order to fashion a solid basis for future planning and administration of the state's penal system. In relation to the Stay Order, the State of Oklahoma alleges that the Trial Court has mandated an arbitrary reduction of the inmate population with fixed schedules in the face of a reasonable and feasible State plan already adopted and designed to remove the conditions complained of which has met with the consent of all of the parties. The State of Oklahoma does not challenge or dispute the fact of overcrowding at the two penal facilities affected by the reduction order, but it does emphatically argue that those conditions are not such as to constitute cruel and unusual punishment proscribed by the Eighth Amendment. During oral argument, counsel for the State of Oklahoma emphasized that the record simply does not support the Trial Court's findings that the inmates at the two affected facilities are being subjected to cruel and unusual punishment. On the contrary, it was contended that they are not in anywise ill treated.
 
 
 55
 Bobby Battle, et al. (the inmate class), by and through the American Civil Liberties Union, have resisted the Motion for Stay, pointing to the uncontroverted facts of overcrowding and the intolerable conditions of confinement found by the Trial Court to constitute cruel and unusual punishment. Battle contends that the facts found are not denied by the State of Oklahoma and that the "defendants totally ignore the danger which these practices (overcrowding in cells, inadequate ventilation, fire protection and sanitation) place the inmate population in." Battle argues that the Trial Court's order was issued after careful, deliberate proceedings and consideration, on the basis of overwhelming evidence of unconstitutional prison conditions. Further, Battle alleges that the State of Oklahoma is not entitled to a stay simply because it must go to some extra effort in order to comply. Battle argues that the State fails on each of the four factors this Court must consider in granting the requested stay: (1) whether the State has made a strong showing that it is likely to prevail on the merits of the appeal, (2) whether the State has shown irreparable injury if the stay is not granted, (3) whether a stay will substantially harm the other parties to the litigation, and (4) where the public interest lies. Battle contends that the State of Oklahoma has virtually ignored these requirements.
 
 
 56
 The United States of America, as Plaintiff Intervenor, by and through the Attorney General, Department of Justice, has moved to deny State's Motion for Stay, alleging, inter alia, that the State of Oklahoma has not specifically addressed itself to the four (4) elements of the criteria above referred to in determining the propriety of a stay order pending compliance with the Plan. Furthermore, the United States argues that even had the State done so, it could not have prevailed in the face of the continuation of physical conditions and practices at the two institutions which the District Court found to constitute cruel and unusual punishment in relation to the inmate population. The United States urges that the stay be denied in that the continuation of the intolerable conditions will require inmates to suffer substantial harm by being forced to live in less than 20 square feet and to be housed in facilities which are unfit for human habitation. Further, the United States argues that the State's Plan, consented to by the parties, was not submitted at or during any of the three hearings dealing with the issue of overcrowding and that, in fact, the Plan was not written until after the trial court's May 24, 1977, bench ruling and was not presented to the parties until June 13, 1977. The record confirms this contention. The United States also alleges that the inmate reduction order was orally communicated by the Court on May 24, 1977 and that the parties were directed to confer upon the timetable, knowing that the Court was considering a range of 90 to 180 days. Again, the record bears this out. (R., Vol. I, p. 282.) However, the United States does agree that the parties did present to the Court a draft order which contained the Plan's recommended construction timetable, but which did not deal with either the numerical or time limitations ordered by the Trial Court from the bench. Accordingly, the United States contends that the Trial Court's order requiring a reduction of inmate population on a timetable basis is clearly within the equitable power of the Court and a matter directly addressed by the Court at the conclusion of the May 24, 1977 hearing.
 
 DISPOSITION
 
 57
 We hold that the challenged Order of the District Court is supported by substantial evidence. We direct that the Stay Order Pending Appeal entered by this Court as thereafter extended and continued, be and the same is hereby vacated.
 
 
 58
 We hold that the Trial Court's finding that the overcrowding inmate population at the two subject Oklahoma institutions constitutes cruel and unusual punishment proscribed under the Eighth Amendment to the United States Constitution, is supported by substantial evidence. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, supra. In that case the Court held that a state prisoner's civil rights complaint lodged under 42 U.S.C. § 1983 that he had been subjected to cruel and unusual punishment for inadequate treatment of a back injury while engaged in work in the Texas penitentiary must be entertained, and that deliberate indifference by prison personnel to a prisoner's serious injury or illness constitutes cruel and unusual punishment contravening the Eighth Amendment. The court there reviewed the history of the constitutional prohibition of cruel and unusual punishment. It noted that the primary concern of the constitutional drafters was to proscribe "tortures" and other "barbarous" methods of punishment. The court then related:
 
 
 59
 Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. See, e. g., Gregg v. Georgia, supra (428 U.S. 153) at 171, (96 S.Ct. 2909 at 2924) (plurality opinion); Trop v. Dulles, 356 U.S. 86, 100-101, (78 S.Ct. 590, 597, 598, 2 L.Ed.2d 630) (1958); Weems v. United States, 217 U.S. 349, 373 (30 S.Ct. 544, 551, 54 L.Ed. 793) (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ," Jackson v. Bishop, 404 F.2d 571, 579 (C.A. 8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, supra, (356 U.S.) at 101, (78 S.Ct. 590 at 598); see also Gregg v. Georgia, supra, (428 U.S. 153) at 153, (96 S.Ct. 2909) (plurality opinion); Weems v. United States, supra, (217 U.S.) at 378, (30 S.Ct. 544, 553), or which "involve the unnecessary and wanton infliction of pain," Gregg v. Georgia, supra, (428 U.S. 153) at 153, (96 S.Ct. 2909) (plurality opinion); see also Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, (67 S.Ct. 374, at 376, 91 L.Ed. 422) (1947); Wilkerson v. Utah, supra, (996 U.S. 130) at 136, (25 L.Ed. 345).
 
 
 60
 These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," In re Kemmler (136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519,) supra, the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. Cf. Gregg v. Georgia, supra, (428 U.S. 153) at 171-74, (96 S.Ct. 2909 at 2924-25) (plurality opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the commonlaw view that "(i)t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself."
 
 
 61
 In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) the Supreme Court stated, inter alia :
 
 
 62
 Of course, the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts. This does not mean that judges have no role to play, for the Eighth Amendment is a restraint upon the exercise of legislative power.
 
 
 63
 "Judicial review, by definition, often involves a conflict between judicial and legislative judgment as to what the Constitution means or requires. In this respect, Eighth Amendment cases come to us in no different posture. It seems conceded by all that the Amendment imposes some obligation on the judiciary to judge the constitutionality of punishment and that there are punishments that the Amendment would bar whether legislatively approved or not." Furman v. Georgia, 408 U.S. (238) at 313-314, (92 S.Ct. 2706, 2825, 33 L.Ed.2d 346) (White, J. concurring.)
 
 
 64
 428 U.S. at p. 174, 96 S.Ct., at p. 2925.
 
 
 65
 It is the obligation of the federal courts to be ever alert not to intrude into the affairs of state prison administration unless there is displayed a clear failure by the State to take cognizance of an inmate's valid federal constitutional rights. We are satisfied that in the instant case neither this court nor the District Court has interfered with matters in the sole discretion of state officials. We believe that while an inmate does not have a federal constitutional right to rehabilitation, he is entitled to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well being.
 
 
 66
 The State of Oklahoma argues that if this Court affirms the Trial Court's order and if the inmates are transferred to other institutions " which have less security, or operating with greater populations than are desirable" that such action will place violent and passive inmates in close association, reduce supervision, increase the likelihood of escape and subject the people of Oklahoma to increased danger. We would wish such risks away if wishing served the purpose. We agree with the Trial Court finding, that while the State of Oklahoma has made significant progress in correcting many of the abuses and/or providing for new or additional facilities, personnel and programs within its penal system, still the State has not prevented the degenerated overcrowding conditions which have come to pass at the Oklahoma State Penitentiary at McAlester and at the Oklahoma State Reformatory at Granite. The transfer of the inmates as ordered by the Trial Court is, of course, subject to change or modification if the District Court deems such action necessary and proper in the future. Viewing the facts and circumstances contained in the record in their totality, we hold that the Order here challenged must be affirmed. While neither this Court nor the District Court holds to the proposition that prisoners subjected to the punishment of incarceration are entitled to the rights and privileges of one who has not committed a crime against person or property crying out for retribution, still the infliction of cruel and unusual punishment cannot be countenanced in an orderly society. While the rights and privileges necessarily lost and, in effect, surrendered by prisoners in punishment for crimes committed are many and varied, they cannot be denied all rights and privileges. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). See also : Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Cooper v. Pate,378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); McCray v. Sullivan, 509 F.2d 1332 (5th Cir. 1975); Detainees of Brooklyn H. of Det. for Men v. Malcolm,520 F.2d 392 (2nd Cir. 1975); Anno., Cruel and Unusual Punishment, 51 A.L.R.3rd 111.
 
 
 67
 WE AFFIRM the Trial Court's order, findings and conclusions of June 14, 1977. We vacate the stay order.
 
 
 68
 ---------------
 
 
 
 6 Organizational standards:
 70 sq. feet: National Sheriff's Association at 63 (1975)
 70 sq. feet: Building Officials and Code Administrators, Inc., BOCA Basic Building Code, 1975 § 201.3
 70 sq. feet: National Clearinghouse for Criminal Justice Planning and Architecture.
 75 sq. feet: The American Correctional Association Manual of Correctional Standards 49
 80 sq. feet: National Advisory Commission for Criminal Justice Standards and Goals, Corrections, Standard 11.1, page 353
 90 sq. feet: The International Conference of Building Officials, Uniform Building Code § 1307B, p. 83
 Cases:%1
 60 sq. feet: Pugh v. Locke, supra.
 75 sq. feet: Ambrose v. Malcolm, 414 F.Supp. 485 (S.D.N.Y. (1976).
 88 sq. feet: Inmates of Suffolk County Jail v. Eisenstadt, supra.