Bobby BATTLE et al.,
Plaintiffs-Appellees,

and

United States of America,
Plaintiff-Intervenor-Appellee,

v.

Park J. ANDERSON et al.,
Defendants-Appellants.

No. 78–1889.

United States Court of Appeals,
Tenth Circuit.

Submitted Feb. 13, 1979.

Decided March 15, 1979.

---

Louis W. Bullock, Jr. of Chapel, Wilkinson, Riggs, Abney & Keefer, Tulsa, Okl. (Carl G. Stevens, American Civil Liberties Union, Oklahoma City, Okl., with him on brief), for plaintiffs-appellees Battle et al.

Dennis J. Dimsey, Dept. of Justice, Washington, D. C. (Julian K. Fite, U. S. Atty., Muskogee, Okl., Drew S. Days, III, Asst. Atty. Gen., and Jessica Dunsay Silver, Dept. of Justice, Washington, D. C., on brief), for plaintiff-intervenor-appellee United States.

John F. Fischer, II, Asst. Atty. Gen. (Jan Eric Cartwright, Atty. Gen., of Oklahoma, Oklahoma City, Okl., on brief), for defendants-appellants Park J. Anderson et al.

Before BARRETT, DOYLE and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

On October 26, 1977, this Court affirmed an order of the District Court directing the defendants-appellants, hereinafter, for convenience only, referred to as the State of Oklahoma to effect specific inmate population reductions at two badly deteriorated penal institutions which were unquestionably overcrowded, resulting in degenerative conditions and circumstances so injurious to health, safety and security as to amount to cruel and unusual punishment prohibited by the Eighth Amendment of the United States Constitution. *Battle v. Anderson*, 564 F.2d 388 (10th Cir. 1977). We there observed:

We, too, [just as the District Court], abhor any situation or circumstance requiring the intervention of the federal courts in matters involving the administration, control and maintenance by the sovereign states of their penal systems. It is a delicate role assigned to the federal courts to display that restraint so necessary "in the maintenance of proper federal-state relations." *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 . . . (1963). . . . *We are* cognizant of the complexity of problems confronting the states in upgrading not only a host of state institutions and facilities but in properly maintaining them both physically and with adequate personnel. If we were to close our eyes to the financial burdens a variety of "piecemeal" federal court orders would impose upon the states and their taxpayers we would refuse to come to grips with reality. We are in sympathy with the ever increasing budgetary demands upon state taxpayers. There are constitutional and statutory limits on a state's capacity to finance capital outlays. No one state governmental body is authorized to dictate a specific course of action. The governmental wheels often turn slowly simply as a result of pressure generated by a multitude of needs. Those charged with the administration of state government must pick and choose, set priorities and goals, many of which must later be abandoned or delayed because of unforeseen emergencies.

. . .

564 F.2d at pp. 392, 393.

The jurisdiction of the District Court was first invoked on April 24, 1972, when Bobby Battle, then an inmate at the State Penitentiary located at McAlester, Oklahoma, filed a *pro se* civil rights action. The American Civil Liberties Union of Oklahoma thereafter provided Battle with legal assistance. Following a serious and disastrous riot at the McAlester prison in 1973 resulting in $20 million in property damage and tragic loss of lives, the United States was granted the right of intervention under the

Civil Rights Act of 1964, 42 U.S.C.A. § 2000h–2.

In 1974 the District Court conducted hearings resulting in an order entered May 30, 1974, which found generally for plaintiffs and plaintiff-intervenor on issues of racial discrimination, segregation, disciplinary rules, punishment for disciplinary procedures, administrative lockups, use of force, access to the courts, religious freedom and other matters. The District Court refers to that order as *Battle I. Battle v. Anderson,* 376 F.Supp. 402 (E.D.Okl.1974). The Court held several compliance hearings, generally at six month intervals, on the constitutional violations found in these areas and found that the State of Oklahoma was making progress but that the full mandates of the order had not yet been met.

On June 14, 1977, the District Court entered an Order following hearings conducted on a Motion for Supplemental Relief involving "overcrowding" of inmate population at two Oklahoma State penal institutions, i. e., the Oklahoma State Penitentiary at McAlester, Oklahoma, and the Oklahoma State Reformatory at Granite, Oklahoma. The District Court found that the overcrowded conditions existing at the two penal institutions whose total inmate population then was 4,600 in a system designed for 2,400, which amounted to an overcrowded populace of 191%, amounted to cruel and unusual punishment in relation to the physical and mental well-being of the inmates. The District Court ordered that the State of Oklahoma effect reductions in the inmate population at the McAlester penitentiary at the rate of 100 per month until the total population is reduced to 800 and reduction of the population at the reformatory at Granite at the rate of 50 per month until reduced to 450. This Court affirmed October 26, 1977, in *Battle v. Anderson, supra.* We there acknowledged:

> We are satisfied that the State of Oklahoma has, since the 1973 disastrous riot, made significant progress in upgrading its penal system. The State contends that the 1974 Oklahoma Legislature appropriated $16,285,090.00 to the penal system, representing an increase of 46.9% over the previous year; that the 1976 Legislature appropriated $44,000,000.00, an increase of 534% over the 1973 appropriation. There can be no doubt that the State of Oklahoma has, as the District Court acknowledged, made significant strides and efforts to remedy the serious deficiencies. Even so, the Court's finding that the *presently existing* overcrowding condition at the two facilities, when considered with other circumstances, constitutes cruel and unusual punishment is not clearly erroneous.

564 F.2d at p. 400.

The instant appeal was primarily generated by the District Court's Order of February 7, 1978, directing the plaintiff (the Civil Liberties Union) and the plaintiff-intervenor (the United States by and through the Civil Rights Division, Department of Justice) to ". . . report on the level of defendants' compliance with its prior orders in this cause, *Battle I,* 376 F.Supp. 402 (1974) and *Battle II,* 447 F.Supp. 516, *aff'd,* 564 F.2d 388 (10th Cir. 1977)." [R., Vol. IV, p. 64.] Detailed investigations were pursued by many experts employed by plaintiffs and plaintiff-intervenor leading to the "Plaintiffs' and Plaintiff-Intervenor Joint Compliance Report" filed with the District Court on July 24, 1978. [R., Vol. II, Cover Page.] That report, supplemented by exhibits, is 43 pages in length. The United States (plaintiff-intervenor) ". . . conducted extensive discovery into the current operations of the Oklahoma Department [of Corrections]." [R., Vol. IV, p. 65.] The matter of the Joint Compliance Report was brought on for hearing by the District Court on August 14 and 15, 1978, only one week after the State of Oklahoma filed its "Response to Joint Compliance Report." [R., Vol. IV, pp. 1–38.] The District Court allowed the State of Oklahoma only 10 days within which to respond to the Joint Compliance Report. On August 4, 1978, the Court denied the State of Oklahoma's Motion for Continuance and for Pre-Hearing Conference.

The Response is, we believe, significant in several respects, to-wit: (a) nothing in the record indicates that the District Court conferred with the respective parties prior to the formal evidentiary hearings held on August 14–15, 1978; thus, one may conclude that the Court did not find any need to make preliminary inquiries or requests for current information relating to the State of Oklahoma's position or intended action on the issues; (b) there is no contradiction to the contentions contained in the Response that "The defendants are making considerable progress in reducing the number of prisoners in certain space areas. In March of 1977, there were 742 inmates housed in areas of approximately 20 square feet per inmate. By August of 1978, this number was reduced to 344. In March of 1977, there were approximately 284 inmates at Oklahoma State Reformatory housed in areas of approximately 20 square feet per inmate. This number by August of 1978 was reduced to 166. In March of 1977, there were approximately 799 inmates at the Oklahoma State Penitentiary housed in areas providing 21 to 39 square feet per inmate. By August of 1978 this number was reduced to 8." [R., Vol. IV, pp. 8, 9.], (c) that the replacement of the penitentiary "is currently being designed . . . [and] planned" [R., Vol. IV, p. 10], and (d) it effectively establishes that the State of Oklahoma has pursued endeavors to correct, remedy and cure all of the subject "deficiencies" noted in the Joint Compliance Report.

The two-day hearing was thus quick on the "heels" of the filing of the Joint Compliance Report and the State's Response. At the hearing the plaintiffs and plaintiff-intervenor called as witnesses the wardens of the two critical state penal institutions, and some four or five State of Oklahoma officials, together with expert testimony. Some eight depositions were also introduced. The State of Oklahoma called five witnesses.

Our examination of the record impresses us that the District Court, while proceeding in complete good faith, nevertheless may not have provided the State of Oklahoma adequate opportunity to develop those objectives it was then pursuing to accomplish the remedies ordered by the Court. The District Court did accept the Joint Compliance Report as the central focus at the hearing. This is evidenced, in our view, by this recitation contained in the Court's order of September 8, 1978: "The hearing on August 14, 15, 1978, was not a trial in the normal use of the term. Rather, it was an evidentiary compliance hearing to determine if the defendants were in compliance with this Court's prior orders . . . ." [R., Vol. IV, p. 85.]

The remedies ordered by the District Court in its Order of September 11, 1978 are all-inclusive. In the area of overcrowding, the Court required that by April 1, 1979, each inmate in the Oklahoma State Penitentiary at McAlester be housed one to a cell; and that by August 1, 1979, each inmate in the other prisons within the system be housed in at least 60 square feet if any inmate lives in a cell or room and at least 75 square feet if an inmate lives in a dormitory. Various deadlines concerning compliance with the District Court's prior orders on the health care system, access to the courts, racial segregation and discrimination, use of force and due process were also established. [R., Vol. IV, pp. 92–95.] These "deadlines," if not met, could result in the closing of the offending facilities. They are, with one exception, set for 1979, most of which require compliance by mid-year.

State Senator Al Terrill, who serves as Chairman of a Joint Oversight Committee on the Penal System which is, in turn, a Special Investigatory Committee on the Criminal Justice System in the State of Oklahoma testified that his committee, consisting of five members from the House, five members from the Senate and ten members at large, submitted a "final report" listing detailed, comprehensive recommendations. Senator Terrill testified that the Committee recommended "prison facility repairs" in an estimated sum of $1,020,-216.00, $750,000.00 of which had been already appropriated by the legislature in

1977, along with some $270,216.00 for the statewide Medical Plan. [R., Vol. I, pp. 16–22.] The Senator stated that in his judgment the Oklahoma legislature was fully committed to the recommendations in his Committee's report which are aimed at alleviating many of the problems cited in the District Court's prior orders. [R., Vol. I, p. 21.] Senator Terrill stated that his Committee had a close working arrangement with the Department of Corrections and the Governor's office. Significantly, the committee developed *alternative* remedies.

Dr. Warren Benton, Director of the Oklahoma Department of Corrections, testified that an architectural firm had submitted schematics of a plan for renovation of the penal institutions at McAlester and Granite and that in anticipation of the plans, the State of Oklahoma had submitted an application to the Law Enforcement Assistance Administration, Department of Justice, Washington, D. C., for a federal grant and that:

A. . . . we also are initiating all of the other procedures to make this application.

But it is our hope that the Federal Government and LEAA might look to assisting us to some extent in doing this very expensive project.

Q. What is your other source of funds other than the LEAA grant?

A. That would be the Legislature.

Q. Is there any way that you can submit proof to the Court that the necessary funds have been committed to begin these recommendations by September 14th?

A. No, there isn't any way I can do that.

Q. When will the Legislature be reconvening?

A. In next January.

Q. And you don't expect to hear about your grant prior to September 14th either, do you?

A. Oh, no, I would say it would be three or four months.

\*       \*       \*       \*       \*       \*

Q. Dr. Benton, plaintiffs recommend that the defendants be given until September 14, 1978, again to reduce McAlester to 800 and Granite to 450. Can this be done by that date?

A. No, there is no way that we could do that.

Q. Would society face any risks if this were attempted by that date, and if so what would the risks be?

A. Well, the risk would involve placing a lot of inmates in institutions that have no room for them, and also don't have the security necessary to contain them, and as a result, I think that the number of escapes would be extraordinary.

Q. However, you have taken measures to continue reducing the population of McAlester, have you not?

A. Yes, yes, we will be reducing the number of inmates allowed at McAlester by 50 inmates a month.

[R., Vol. I, pp. 188–191.]

Upon cross-examination by Mr. Ory, attorney for the Department of Justice, Dr. Benton testified that the LEAA grant application had been submitted very recently (he testified on August 15, 1978) and that:

. . . the reason we waited until last week was because we wanted to have the architect work on the project so that they had a reasonable idea as to the appropriate amount of money to ask for.

[R., Vol. I, p. 192.]

No other questions were asked Dr. Benton by Mr. Ory in relation to the LEAA grant.

Dr. Benton was cross-examined by Mr. Bullock, attorney for plaintiffs, in part, as follows:

Q. Now would you tell me whether or not Granite and McAlester will be in compliance with that order on September 14th?

A. No, they won't.

Q. And have you asked this Court's permission to be removed from the requirements of that order?

A. No, I think our position is that we are doing as much as we conceivably can.

Q. I see, but you haven't come in and asked this Court's permission; you have chosen to ignore it, is that correct?

A. No, I don't think that is appropriate. I think what I am trying to do is to demonstrate we are trying as hard as we can, and I would hope that if the Court has to consider your suggestion that institutions might be closed that the Court would take this into consideration.

Q. Now, it would have been possible, would it not, for the Oklahoma Legislature to have appropriated the funds at least at this time to correct those deficiencies at McAlester and Granite?

A. Well, the Legislature substantially—they have substantially appropriated the funds necessary to deal with all of the identified problems everywhere but McAlester and Granite, and to the extent that we are not doing things at McAlester and Granite it is because to do them would be not cost effective in terms of the other plans for the penitentiary and reformatory. The Legislature specifically stipulated this in the appropriation that was made. They said that funds shall not be spent.

Q. The Legislature could have planned the renovation of McAlester and Granite this session, could have they not?

· A. That's what they have done.

Q. Is (sic) there any funds in the present budget to prepare construction drawings for the renovation of Granite Reformatory?

A. It takes six to eight months to design the construction documents for the penitentiary and the reformatory replacement. Therefore if they appropriated the funds we would have been unable to expand them until well into the next session. Therefore we concluded that it would be inappropriate to request the funds.

[R., Vol. I, pp. 211, 212.]

Counsel for State of Oklahoma, in closing statements, referred to some 700 new "housing units" which have been built by the State meeting ACA standards, including the biggest one at Lexington A & R for 400 inmates, and that new construction then underway would, within the next few years, add housing space for 631 additional inmates. [R., Vol. I, p. 325.]

Warden Norman Hess of the Oklahoma State Penitentiary, McAlester, testified that no blacks and whites (inmates) occupy double occupancy cells because they do not choose to do so; that, as a policy matter, because of "overcrowding," inmates are limited to only two manila folders of legal material [R., Vol. I, p. 30.]; that there is still poor ventilation there; and that insofar as other legal materials are concerned, inmates are authorized personal correspondence and a total of 10 law books [R., Vol. I, p. 33.]. With a lot of incoming mail, Warden Hess further said: they were greatly concerned with inmates "building bonfires with paper material in their cells." [R., Vol. I, p. 34.]; in regard to religious services, the Indians are in process of obtaining "gourds and beads and drums." [R., Vol. I, p. 36.]; and that the policy is that inmates of different races "should not be forced to cell together." [R., Vol. I, p. 36.] Hess expressed his belief that tension would rise if cells were forced integrated. [R., Vol. 3, p. 36.]

At the conclusion of arguments, the District Court observed that while in fairness it "must say" that the State "has done much in the last four years by way of prison reform" that even so the "present prison condition continues to represent an absolute affront to our society." [R., Vol. I, pp. 331, 332.] In view of the heavy trial schedule confronting the court, plaintiffs' counsel was requested to prepare and submit findings of fact and conclusions of law within a reasonable period of time for the Court's consideration "specifically detailing existing noncompliance with the constitutional requirements." [R., Vol. I, p. 333.] The Court concluded by observing that if the compliance schedule "is not met, and if there is not a dramatic change in the prison conditions the defendants" will be held in contempt of court subject to fine "maybe as

much as $25,000.00 a day." [R., Vol. I, p. 334.]

■ In our view the observations by the Court in *Gates v. Collier*, 407 F.Supp. 1117 (N.D.Miss.1975), are applicable here:

Constitutional treatment of human beings confined to penal institutions, of course, is not dependent upon the willingness or the financial ability of the state to provide decent penitentiaries. Most emphatically, the constitutional rights of inmates at Parchman must be honored by Mississippi if the State is to operate that institution as a penitentiary. See *Finney v. Arkansas Board of Correction*, 505 F.2d 194 (8 Cir. 1974); *Wyatt v. Aderholt*, 503 F.2d 1305 (5 Cir. 1974); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), aff'd 442 F.2d 304 (8 Cir. 1971). Nevertheless, in achieving constitutional compliance no court is bound to invoke draconian measures, particularly when another course, less drastic and already initiated, seems more likely to produce satisfactory results.

407 F.Supp., pp. 1120, 1121.

The Court in *Jordan v. Wolke*, 460 F.Supp. 1080 (E.D.Wis.1978) recognized that the matter of cost should be carefully considered when a court fashions an affirmative remedy for particular constitutional violations.

In *Campbell v. McGruder*, 188 U.S.App. D.C. 258, 580 F.2d 521 (1978), the Court dealt with an appeal from various orders entered by the District Court granting injunctive relief with respect to jail conditions. The court held that doctrines of comity and abstention did not preclude the federal court from making rulings concerning constitutional rights of detainees which involved, *inter alia*, overcrowding. The Court rejected the contention that *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) prohibits the intervention of the federal court, even though the Court did recognize that *Rizzo* teaches that a federal court should refrain from assuming a comprehensive supervisory role via its injunctive powers over broad areas of local government for the purpose of preventing speculative and probably only sporadic future misconduct by local officials toward an imprecise class of potential victims. The Court in *Campbell* did feel compelled to observe:

Although we do not read *Rizzo* as requiring total abstention, we are not insensitive to its more general admonition against excessive intervention in local government. A federal court must practice special restraint in the exercise of its injunctive powers in this area [continued use of certain penal facilities], presuming that local officials will comply with the law in good faith and leaving them as much room as possible to devise their own methods of compliance.

580 F.2d, at p. 526.

■ We would be remiss if we did not recognize that the element of good faith is an important consideration in the sensitive area of weighty governmental interests involved. We are impressed that the District Court's order is not challenged in respect to its constitutional foundations. The challenge is rather directed to the remedial requirements of the order. In our view, the District Court has not "closed the door" to alternative remedies. The State of Oklahoma has not sought a modification or amendment to the order of September 11, 1978. It contends, however, that the District Court has denied alternative remedies set forth in its feasibility study which would adequately meet the deficiencies.

■ It is our view that because the time frame for possible state action in relation to the LEAA grant, completion of detailed architectural plans for renovation, pursuit of various plans and programs designed to afford relief in many other areas of concern was so close at hand when the District Court proceeded to enter the compliance order following the August 14–15, 1978, hearings that it is important and in keeping with the sensitive balance required in the circumstances that the cause be remanded for supplemental proceedings to determine the current status of the State of Oklahoma's efforts to alleviate the various defi-

ciencies and to provide satisfactory remedies therefor. There is tremendous public interest involved in the subject matter of this litigation. Under the circumstances, we recognize the familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of molding its remedies is, of course, dictated by the public interest involved. *United States v. Morgan,* 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939). The Court will give careful and considered treatment to those remedies urged by the State of Oklahoma.

■ We decline at this time to affirm, reverse or modify the District Court's order of September 11, 1978. Instead, we remand this cause to the District Court for the purpose of conducting further hearings in order to ascertain the current status of the steps undertaken or committed to be undertaken by the State of Oklahoma to alleviate the constitutional deficiencies found by the District Court. The State of Oklahoma is requested to address itself to all possible remedial steps in order to comply with the existing deficiencies. We retain jurisdiction in this cause and direct the District Court to certify a supplemental record incorporating the District Court's findings and conclusions to this Court not later than May 1, 1979.

Remanded with instructions.

WILLIAM E. DOYLE, Circuit Judge, concurring.

The disposition which we herein make is an interim one in that we are remanding the case back for a further effort of the parties to reach an agreement with respect to satisfying the requirements of the Constitution. At the same time, we are retaining jurisdiction pending this effort being made.

I do not believe, in view of the nature of the disposition, that an opinion is necessary. My feeling is that all of the parties, the Oklahoma officials and the plaintiffs, as well as the United States, are aware of what the problem is and what is needed in order to solve it.

I am not, however, generally in disagreement with the opinion of my brother Barrett.

I concur fully in the remand for the present purpose.

McKAY, Circuit Judge, concurs in the above statement.