Arnold JONES, Miguel Villanueva, Stanley D. Davis, Eddie Tate, Richard Calanche, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, Willie L. Brown,[1] Mayor of the City and County of San Francisco, Michael Hennessey, Sheriff of the City and County of San Francisco, and San Francisco County Board of Supervisors, Defendants.

No. C–91–3453 WHO.

United States District Court, N.D. California.

July 18, 1997.

---

1. Mayor Frank Jordan was succeeded by Mayor Willie L. Brown. Accordingly, the Court *sua sponte* changes the instant case caption to "Willie L. Brown, Mayor of the City and County of San Francisco."

Morton Cohen, Beth Parker, Equal Rights Advocates, James Severson, McCutchen, Doyle, Brown & Enersen, San Franciso, CA, for Plaintiffs.

Louis Renne, City Atty., Joanne Hoeper, Deputy City Atty., San Francisco, for Defendants.

## OPINION AND ORDER

ORRICK, Senior District Judge.

The plaintiff class, consisting of certain inmates of San Francisco Jail Number 3 ("Jail No. 3" or "the jail") in San Bruno, California, brought suit against the City and County of San Francisco ("City") and various city officials, challenging the constitutionality of the conditions of their confinement at Jail No. 3. After settlement, dismissal, reopening of the case, and the issuance of findings of fact by the Special Master, the parties filed cross-motions for summary judgment. The Court grants plaintiffs' motion for summary judgment in part, grants defendants' motion in part, and denies both motions in part. As to those issues decided in plaintiffs' favor, the Court enjoins defendants to draft a plan to remedy the described constitutional violations.

### I.

Plaintiffs originally filed this action in May 1991, then entitled *William Besk v. City & County of San Francisco*, seeking damages for the class representatives and injunctive relief for the class. After early discovery and negotiations, the parties entered into a Stipulation of Dismissal ("*Besk* Stipulation") filed May 24, 1993, in which plaintiffs agreed to dismiss the action if defendants complied with thirty-three requirements contained therein. After a fairness hearing, the Court approved the *Besk* Stipulation and dismissed the case.

Defendants' alleged violations of those requirements prompted plaintiffs to request that the Court reopen the case. Plaintiffs filed an amended complaint on March 18, 1994, bearing the names of a new group of class representatives, and charging defendants with noncompliance with the terms of the *Besk* Stipulation. On April 22, 1994, the Court appointed Allen F. Breed as Special Master to aid the Court in determining whether defendants complied with the terms of the *Besk* Stipulation. On August 30, 1994, the Special Master issued his report, finding that defendants had improved some of the living conditions at Jail No. 3, but in many cases they failed to completely or even substantially comply with the Besk Stipulation. The Court reopened the case on November 17, 1994.

The parties stipulated and the Court ordered that it would appoint the Special Master to investigate a list of conditions at Jail No. 3 and issue findings and conclusions of fact. (Stip. & Order of Appointment, filed Mar. 17, 1995, at 8.) The Special Master submitted his Findings and Conclusions of Fact ("Findings") to the parties in December 1995. The Court, after considering the parties' objections, approved the Findings, and subsequently ordered the parties to file cross-motions for summary judgment.

At the hearing on these motions, defendants argued that the existence of numerous changed conditions since the submission of the Findings left the Court with an outdated and incomplete factual record upon which to rule. The Court agreed. Nonetheless, the Court granted defendants' motion for summary judgment as to issues relating to passive recreation and the availability of exercise equipment; the Court found that even if inadequacies existed in these areas, they could not constitute Fourteenth Amendment violations. (*See* Order filed Oct. 28, 1996 at 15.) The Court denied defendants' motion as to the claims of each of the individual class representatives, finding that disputes of material fact precluded summary adjudication. As to all other factual issues, the Court submitted the motions pending the completion of a Supplemental Report to the Special Master's Findings and Conclusions of Fact ("Supplemental Report"). (*Id.*)

Also at that hearing, defendants moved to decertify the class on the grounds that named plaintiffs did not fairly or adequately represent the class in accordance with Rule 23(a)(4) of the Federal Rules of Civil Procedure. The Court granted that motion in part, but ruled that it would permit the continued certification of the class if plaintiffs named a current inmate at Jail No. 3 who wished to serve as an additional class representative. (*See id.* at 14.) Plaintiffs subsequently moved to add Sedgwick McKneely ("McKneely") and Treal Malone ("Malone") as class representatives. The Court granted the motion to add McKneely as an additional

class representative, but denied the motion as to Malone.

The Special Master then submitted the Supplemental Report, deemed filed on February 21, 1997, on the conditions prevailing at the jail as of November 1, 1996. The Court then ordered the parties to file their written objections to the report, if any, within ten days. (*See* Order Feb. 21, 1997.) On March 7, 1997, defendants filed a motion to correct the Supplemental Report ("motion to correct"), again alleging that numerous "changed conditions" altered the facts of the action so as to make the Supplemental Report deficient in numerous respects. In response, the Court ordered that the factual record would close as of April 1, 1997, so as to account for recent changes without making summary adjudication impracticable. (Order filed Apr. 1, 1997 at 2.)

Defendants' motion to correct consisted of sixty-one pages of objections, divided into categories of "general" and "specific" objections. The Court submitted the specific objections, but ruled on the general objections, sustaining defendants' objection to those few portions of the Supplemental Report that contain conclusions of law rather than of fact.

2. The Court's rationale for its rulings on each of the general objections is as follows:

First, any statements of law recited within the Special Master's "guiding principles" will not earn any deference from the Court. (*See* Supp. Report at 10–11).

With regard to the closing of the factual record, while any cut-off date is "arbitrary," the Supreme Court's holding in *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994), does not require the Court to incessantly delay its issuance of judgment while it repeatedly readjusts its aim on a moving target. (*See* Order Apr. 1, 1997.) Rather, Farmer suggests that a district court may, "in [its] discretion," permit or refuse to permit parties to rely on factual "developments that postdate the pleadings and pretrial motions." See *Farmer*, 511 U.S. at 846, 114 S.Ct. at 1983. For the purpose of having a manageable record upon which the Court can base its judgment, the Court exercises its discretion to treat the factual record as closed as of April 1, 1997.

As for defendants' contention that the Supplemental Report gives undue emphasis to the Findings, the Court finds that the Special Master's repetition of many earlier findings is essential to his accurate description of the changes wrought by defendants' alleged improvements.

Otherwise, the Court overruled defendants' general objections.[2]

The Court also denied defendants' motion to compel the deposition of McKneely, finding that additional discovery would be unreasonably duplicative relative as to the claims of the class, and unduly burdensome in delaying resolution of the action. *See* Fed. R.Civ.P. 26(b)(2). The Court allowed for the taking of McKneely's deposition after the Court had resolved the parties' summary judgment motions.

## II.

### A.

The Court may grant summary judgment where there appears "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). Once the moving party has shown the absence of a genuine issue of material fact, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some meta-

In a prior order, the Court already resolved defendants' objection that the continued tenure of the Special Master violates the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, *et seq.*, ruling that the PLRA does not apply to this case. (*See* Order Oct. 28, 1996 at 11–12.)

Defendants also object to the Special Master's reliance upon allegedly impermissible *ex parte* communications with employees of the City, citing the PLRA's prohibition against "any findings or communications ex parte." 18 U.S.C. § 3626(f)(6)(B). Section 3626(f)(6) only applies to special masters "appointed under this subsection," however, and the Court did not appoint the Special Master under the PLRA, but pursuant to Rule 53(a) of the Federal Rules of Civil Procedure. Even if the PLRA governed the appointment of the Special Master in this case, the provision obviously serves to protect parties *excluded* from the Special Master's *ex parte* communications; defendants have no standing to object to the Special Master's conversations with their own employees.

Finally, the Court overrules defendants' objection to each of the summary conclusions, finding nothing repetitive, unnecessary, or prejudicial about these conclusions. (*Cf.* Supp. Report at 198–201.)

physical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). The inferences to be drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

■ Before turning to the merits of plaintiffs' claims, the Court must ascertain the proper standard of review to apply to the Findings. Plaintiffs urge the Court to follow Rule 53(e)(2) of the Federal Rules of Civil Procedure and adopt all findings of fact unless "clearly erroneous," while defendants argue that the findings should not be subject to such deference by the Court.

The "clearly erroneous" standard of Rule 53(e)(2) applies to nonjury actions. In actions tried before a jury, Rule 53(e)(3) allows only for the admission of the Findings as evidence, subject to no deference to the fact finder. The question of the applicable standard of review, therefore, depends on whether one characterizes this action as a jury action or nonjury action. The amended complaint in this action requests injunctive relief as to the class, but damages for the individual class representatives. (Am. Compl. at 19–20.) In their answer, defendants filed a jury demand "on all claims for relief triable thereby." (Answer at 14.) Accordingly, defendants' jury demand applies only to those individual claims, and not to the equitable class claims. The "clearly erroneous" standard must govern the Findings with regard to the equitable claims of the class.

Citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962),

defendants argue that where legal and equitable claims share common factual issues, the legal claims must be tried by a jury prior to adjudication of the equitable claims. *See Beacon Theatres*, 359 U.S. at 508, 79 S.Ct. at 955. They assert that because the Supplemental Report is not entitled deference in a jury trial of the damages claims, the Court cannot now grant any deference to the Findings until a jury has heard all of the evidence and reached a verdict.

These cases do not command such a result. *Dairy Queen* merely held that a district court cannot strike the jury demand of a defendant where legal issues remain in a case. 369 U.S. at 479, 82 S.Ct. at 900. The Court is not striking any jury demand here; defendants will have a jury decide each of the damages claims.

As for *Beacon Theatres*, the Supreme Court deemed impermissible the attempt of a district court to try equitable claims from the bench prior to permitting a jury trial on common issues in the legal claims. The Court reasoned that a court's ruling on common issues would eviscerate a party's right to have a jury try those same issues. 359 U.S. at 510–11, 79 S.Ct. at 956–57. This Court, however, is not subjecting any claims to trial under Rule 52. Rather, it is resolving questions of law presented in motions for summary judgment under Rule 56. It is beyond cavil that the Court may properly resolve some legal claims by summary adjudication prior to a trial of the remaining claims; the summary adjudication of equitable claims, therefore, cannot work any injustice.[3]

More essentially, *Beacon Theatres* and its progeny do not bar the resolution of equitable claims prior to the adjudication of legal claims where the two are independent, such that resolution of the former will not affect the determination of the latter. *See Granite State Ins. Co. v. Smart Modular Technologies, Inc.*, 76 F.3d 1023, 1027 (9th Cir.1996); Charles A. Wright and Arthur R. Miller, 9

---

3. Even were the prior ruling to have some effect on the jury's ultimate conclusion concerning liability, the Federal Rules of Civil Procedure allow the Court to resolve issues in jury actions prior to trial, so as to narrow those triable issues to those containing some material dispute of fact. *See* Fed.R.Civ.P. 56(a) (permitting movant to seek summary judgment as to "all or any part" of a claim); *Id.* at 56(d).

*Federal Practice and Procedure* Civil 2d § 2338 at 220 (1995). In this case, the claim proffered by the class appears easily segregable from those of the named plaintiffs. The named plaintiffs complain of discrete injuries occurring on a specific date in the past, while the class complains of a more generalized harm continuing until the present. The Court's evaluation of the claim of the plaintiff class must focus on the conditions of confinement and defendants' conduct at the time of summary adjudication. *See Farmer v. Brennan,* 511 U.S. 825, 845–46, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994). When resolving the claims of the named plaintiffs, in contrast, the jury must fix its attention on a single event or series of events in the past.

Moreover, even if the Court faced equitable and legal claims sharing the same temporal dimension, the Court's findings as to the class claims would not likely affect a jury's determination of the claims of the class representatives. For instance, the Court's acceptance of the Findings regarding rates of inmate violence will not affect whether a jury finds defendants liable to any particular named plaintiff, because that plaintiff's recovery depends on whether he has actually suffered compensable harm from physical attack. Despite defendants' current posture, defendants' counsel admitted the separateness of the legal and equitable claims during a status conference in which the Court and the parties planned procedures for managing this litigation. Counsel noted,

> And finally, I want to alert the Court that we are really dealing with, in a sense, two separate lawsuits here under the rubric of the Jones case. One is a class action challenging in general the conditions at the jail. The second are individual damages claims on behalf of the six named plaintiffs.

(Tr. Nov. 17, 1994 at 5.)

■ In short, the Court will ensure that defendants' Seventh Amendment right to a jury will be preserved "inviolate," see Fed. R.Civ.P. 38, but it will press on to resolve the summary judgment motion on the equitable claims prior to a trial on the damages claims.[4] *Cf. Granite State,* 76 F.3d at 1027–28. For the purpose of deciding those equitable claims, the Court will adopt each of the Findings unless clearly erroneous. Fed. R.Civ.P. 53(e)(2). For the sake of judicial economy, the Court will address defendants' objections to the Supplemental Report only insofar as a ruling on those objections would affect the outcome of the Court's judgment.

### B.

■ To prevail under § 1983, plaintiffs must demonstrate that defendants acted under color of state law, and that they committed an act or omission depriving them of some right, privilege, or immunity protected by the Constitution or laws of the United States. See 42 U.S.C. § 1983 (Supp.1997); *Redman v. County of San Diego,* 942 F.2d 1435, 1439 (9th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). In order to find the City liable for the acts or omissions of its officials, the Court must find that those acts "implement[ ] or execute[ ] a policy statement, ordinance, regulation, or decision, officially adopted and promulgated by that body's officers," or else that the deprivation was inflicted pursuant to a "governmental custom." *Monell v. Department of Soc. Servs. of City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

■ The parties do not dispute that defendants acted under color of state law, and that the conditions of Jail No. 3 reflect the policy or custom of the City. The focus accordingly moves to whether the conditions of plaintiffs' detention violated their constitutional rights. Although the Eighth Amendment protects convicted prisoners from cruel and unjust punishment, ninety percent of the plaintiff

---

**4.** Defendants take a footnote from the Order of October 28, 1996 out of context, asserting that because the Court ruled that Rule 52(a) did not authorize judgment in this case, the Court must agree that the Court could not decide the equitable claims without a jury. Defendants misinterpret both the Court's ruling and Rule 52(a), which governs findings of a court in bench trials.

The Court merely ruled that Rule 52(a) did not apply here because the action's procedural posture was not that of trial, but of summary adjudication. While the Court's ruling implicitly recognized defendants' right to a jury as to the damages claims of the individual defendants, it did nothing to decide the proper sequence in which the issues in this case must proceed.

class typically remains in pretrial detention, not yet tried or convicted. Pretrial detainees enjoy the greater protections afforded by the Due Process Clause of the Fourteenth Amendment, which ensures that no state shall "deprive any person of life, liberty or property, without due process of law."[5] U.S. Const. amend. XIV; *see Gary H. v. Hegstrom,* 831 F.2d 1430, 1432 (9th Cir.1987). Nonetheless, courts often borrow from less protective Eighth Amendment principles in shaping standards applicable to pretrial detainees. *See Alvarez–Machain v. United States,* 107 F.3d 696, 701 (9th Cir.1996).

■ The Court will find a condition of confinement unconstitutional where plaintiffs can satisfy both the objective and subjective prerequisites for a finding of liability. The objective analysis consists of determining whether the condition amounts to "punishment," because the Constitution prohibits punishment of criminal defendants without due process.[6] *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979). A restriction or condition constitutes punishment where it does not appear "reasonably related to a legitimate governmental objective." *Id.* at 539, 99 S.Ct. at 1874.

■ In addition to this objective standard, courts have required plaintiffs to establish that defendants acted with "deliberate indifference" to plaintiffs' needs. *Anderson v. County of Kern,* 45 F.3d 1310, 1313, *amended by,* 75 F.3d 448 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995). In the Eighth Amendment context, the Supreme Court has interpreted this standard to require that an official subjectively "knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979. In the context of pretrial confinement, as here, it appears that "reckless indifference"

will also suffice to give rise to liability. *Redman,* 942 F.2d at 1442–43. Nonetheless, some indifference must be shown; officials may escape liability "if they respond[ ] reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844, 114 S.Ct. at 1982. In this case, the Special Master has found that defendants had actual and constructive knowledge of every significant deficiency in Jail No. 3 since 1990, as evinced by newspaper accounts, grand jury reports, defendants' own written correspondence, and the repeated proposal of bond measures to finance improvements. (Supp. Report at 186.) To make blatant what was previously merely obvious, the 215-page Findings afforded defendants detailed notice of every inadequacy. Accordingly, the Court proceeds under the assumption that any unreasonable failure of defendants to remedy an obvious deficiency in Jail No. 3 constitutes deliberate indifference for the purposes of satisfying the subjective prerequisite of liability.

### C.

■ Some conditions of confinement may violate the Constitution in combination when they would not do so alone, "but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise...." *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). More typically, the Court must examine each condition in isolation to determine whether it, by itself, constitutes punishment. *Id.* The Court, therefore, analyzes whether each condition—or, where "mutually enforcing," multiple conditions—amounts to punishment under the standard of *Bell.*

---

**5.** Although most of the plaintiff class consists of pretrial detainees, but Jail No. 3 also contains convicted misdemeanants. Where housed together, courts will typically accord both groups the protections of the Fourteenth Amendment to ensure that the pretrial detainees do not suffer any denial of their due process rights. *See, e.g., Fischer v. Winter,* 564 F.Supp. 281, 298 (N.D.Cal. 1983).

**6.** As a matter of standing, plaintiffs also must demonstrate some evidence of actual or imminent harm, *see Lewis v. Casey,* —— U.S. ——, ——, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996), or subjection to excessive risk of injury. *Helling v. McKinney,* 509 U.S. 25, 32–34, 113 S.Ct. 2475, 2480–81, 125 L.Ed.2d 22 (1993) (holding that prisoner stated a claim for relief under the Eighth Amendment for his exposure to second-hand smoke, even though he reported no illness).

■ The parties stipulated to have the Special Master investigate a whole range of conditions, some of which could not possibly implicate plaintiffs' constitutional rights. The Court has already dismissed the portion of plaintiffs' claim relating to the availability of passive recreation and the adequacy of exercise equipment. (*See* Order, Oct. 28, 1996, at 4.) Other conditions intrinsically cannot have constitutional significance, such as the quantity of programs available to inmates, *cf. Alberti v. Klevenhagen*, 790 F.2d 1220, 1228 (5th Cir.1986), and the physical condition of the upper and lower exercise yards. Accordingly, the Court has narrowed its analysis to those particular inadequacies relevant to a determination of whether defendants have abridged plaintiffs' due process rights.

### 1. Overcrowding, Double–Celling, Time Spent Out of Cell.

■ During the first nine months of 1995, Jail No. 3 housed an average of 718 inmates per month. (Findings at 14.) With an official capacity of 557, (*id.* at 8), the jail operated at about 124 percent of capacity, on average. (*Id.* at 14.) Although planners designed the 41–square–foot cells for single occupancy, overcrowding forced defendants to place two inmates in many cells, a practice that "violates all correctional standards" in the Special Master's view. (*Id.* at 38.)

Without sufficient correctional personnel to supervise inmates on the tiers or in the yards, inmates had little opportunity to venture outside their cells. Most inmates spent at least 16 hours a day locked in their cells, with inmates on the fifth and sixth floors being confined for 25 hours at a time every other day, and inmates in administrative segregation facing 23 hour spans of confinement at a time. (Findings at 17–26.) Even when inmates could leave their cells, available day room space on the tiers averaged almost 800 square feet *less* than that mandated by standard correctional practice.

Plaintiffs' lengthy tenure in the jail—an average of 103 days per inmate—makes this level of overcrowding all the more difficult to bear. The many harmful consequences of this overcrowding on inmates' health and safety appear obvious, and they include such phenomena as increased violence due to inadequate supervision levels per inmate, a taxing of the physical facilities such that inadequate plumbing and sewage treatment pose health risks, and a depletion of opportunities for time outside of the cell for such activities as recreation and religious services. (*See* Supp. Report at 28.)

In short, plaintiffs' conditions of confinement amounted to punishment during this period of double-celling. Applying a less stringent Eighth Amendment standard, the Tenth Circuit was "offended by the housing of two men within a little 35–40 square foot 'cubbyhole'." *Battle v. Anderson*, 564 F.2d 388, 395 (10th Cir.1977). The *Battle* court examined applicable design standards and case law, all of which imposed minima for cell space of sixty square feet or greater per inmate. *Id.* The appeals court concluded that such crowding, which closely resembles the double-celling in the 41–square–foot cells in this case, "offends the contemporary standards of human decency." [7] *Id.*

Since the issuance of the Findings, defendants have filled a new jail, Jail No. 8, thereby absorbing the previous overflow from Jail No. 3. Over the first ten months of 1996, average daily jail populations in Jail No. 3 ranged between 482 and 594, with an average of about 92 percent of capacity. (Supp. Report at 16–17.), In the next five months, the population hovered roughly around 530 to 540. (De Souza Supp. Decl. Ex. F.; Williams Decl. ¶ 3.) Defendants no longer house two plaintiffs in a single cell, although they have often avoided the practice only with the eleventh-hour transfer of surplus inmates. (*Id.* at 32–33.) The amount of out-of-cell time has also increased significantly.[8] (*Id.* at 39.)

---

**7.** Although the Supreme Court found nothing constitutionally unsound about double-celling in *Bell*, 441 U.S. at 541, 99 S.Ct. at 1875, the facts appear easily distinguishable. In *Bell*, the inmates lived in 75–square–foot cells—almost twice the size of those in Jail No. 3—and were locked

in those cells for only 7–1/2 hours at night, not, as here, 25 hours at a time. *Id.*

**8.** Day room space on the tiers remains inadequate, however, and defendants' failure to in-

■ Although overcrowding at one time subjected the plaintiff class to punishment in violation of their Fourteenth Amendment rights, the Court must assess whether defendants have shown deliberate indifference on the basis of their "current attitudes and conduct." *See Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993). Defendants' efforts to move inmates from Jail No. 3 to relieve overcrowding preclude any finding of deliberate indifference. Accordingly, the Court grants summary judgment for defendants as to the crowding and space allocation in Jail No. 3.

### 2. *Fire Safety.*

■ Inmates "have the right not to be subjected to the unreasonable threat of injury or death by fire and need not wait until actual casualties occur in order to obtain relief from such conditions." *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir.1985), (citing *Leeds v. Watson*, 630 F.2d 674, 675–76 (9th Cir.1980)); *see also Helling*, 509 U.S. at 33, 113 S.Ct. at 2481 (holding that a "remedy for unsafe conditions need not await a tragic event").

■ On September 14, 1995, a fire and safety consultant for the California Board of Corrections examined Jail No. 3, and identified 24 serious deficiencies. (Findings at 165.) The most blatant of the hazards related to the absence of fire-rated door assemblies needed to contain fires in the jail's atrium—a central hollow portion of the building that would allow any nearby fire to spread rapidly upward—from other portions of the jail. The fire consultant considered the installation and operation of these assemblies one of the *"major keys to life safety"* in the building. (*Id.* (quoting Fire and Safety Review).)

Since the issuance of the Findings, defendants have addressed some of those 24 deficiencies. They have repaired the smoke detector system, fixed fire doors to ensure their proper operation, implemented a quarterly schedule of fire drills, and marked fire doors and extinguishers more clearly. (Supp. Report at 143, 149.)

Despite these commendable improvements, serious deficiencies remain that defendants have not addressed. (*See id.* at 167–70.) Most important, defendants still have not installed fire-rated door assemblies where needed. (*Id.*) Nor have they installed automatic sprinkler systems in those parts of the jail critically lacking sprinklers. (*Id.* at 170.) Defendants also continue to use flammable mattresses, "[among] the greatest fire hazards that exist in correctional settings." (*Id.* at 62.) They have allowed combustible debris to accumulate in safety-sensitive areas, (*id.* at 169), and the jail remains inadequately staffed for proper evacuation during the first shift each day. (*Id.* at 167.) The jail's electrical systems have undergone some improvement, but the over 60–year–old main switchboard and panel feeders have not been retrofitted or replaced, and their deterioration poses considerable hazards. (*Id.* at 171.)

Here, a close question arises as to whether defendants' efforts to remedy some of these deficiencies suffice to pass constitutional scrutiny. Defendants' improvements invoke the Supreme Court's pronouncement that even in the face of harmful conditions, defendants can avoid liability "if they respond[ ] reasonably to the risk." *Farmer*, 511 U.S. at 844, 114 S.Ct. at 1982–83 (interpreting the Eighth Amendment). Nonetheless, the continued presence of serious inadequacies suggests that defendants' response has been something less than reasonable.

The Court does not intend to minimize defendants' efforts, but by failing to install door assemblies or additional sprinklers, defendants have continued to abdicate their constitutional responsibility to provide plaintiffs with reasonable safety from fire. *Cf. Farmer*, 511 U.S. at 844–45, 114 S.Ct. at 1982–83 (finding that the Eighth Amendment imposes a duty to provide inmates with reasonable safety). In determining whether to find deliberate indifference in this case, the Court cannot restrict its examination to whether defendants made substantial efforts to improve safety, thereby excluding any consideration of whether the improvements have actually left inmates reasonably safe from fire. If the Court took such a narrow view,

crease staffing to accommodate the additional

out-of-cell time raises security concerns.

the protections of the Fourteenth Amendment would become arbitrary and have little relationship to the inmates' current conditions of confinement. The Court finds that defendants have not yet responded reasonably to the fire safety risks at Jail No. 3, and that those risks constitute punishment in violation of plaintiffs' Fourteenth Amendment rights.[9]

### 3. *Seismic Safety.*

Although Jail No. 3 lies a quarter mile from the San Andreas fault, and although it faces a 50 percent chance of experiencing an earthquake on the magnitude of 7.0 or greater over the next 50 years, (*see* Findings Ex. 3 at 1), it appears unable to withstand an earthquake of a substantial magnitude. (Supp. Report at 178.) Seismic evaluations of Jail No. 3 have repeatedly found that the building's structural deficiencies pose a "high seismic risk" to human life. (Findings at 167, quoting 1993 seismic study; *see also* Supp. Report at 172, n. 405.) The jail's malfunctioning bar locking system and inadequate staffing further augment the risk by potentially leaving inmates trapped in their cells during and after an earthquake. (*Id.* at 172–73.)

Defendants argue that plaintiffs cannot show that the subjection of plaintiffs to this level of seismic risk amounts to punishment, as required for liability under the Fourteenth Amendment. An analogous Eighth Amendment violation arises where "the risk of which [plaintiffs] complain[ ] is not one that today's society chooses to tolerate." *Helling,* 509 U.S. at 36, 113 S.Ct. at 2482. Defendants argue that society chooses to tolerate such risks because "over 30 publicly-owned buildings in San Francisco ... have the same seismic rating as the Jail," including such facilities as the DeYoung Museum, the California Academy of Science, and

five libraries. (Defs.' Opp'n to Pls.' Mot. for J. at 14–15.)

Defendants' argument does not persuade the Court. That the public tolerates the risk of entering a poorly-constructed library or museum for an hour hardly equates to a tolerance for spending one hundred days continuously trapped in such a facility, particularly where bars inhibit any escape to safety. The existence of building codes requiring that such buildings be vacated, repaired, or demolished, *see, e.g.* San Francisco Building Code § 206, suggests that society does *not* tolerate such risks. Moreover, *Helling* established the standard for liability under the Eighth Amendment, while the more protective Fourteenth Amendment standard applies here. Nothing about subjecting inmates to excessive risks of harm from earthquakes appears "reasonably related to a legitimate governmental interest," *Bell,* 441 U.S. at 539, 99 S.Ct. at 1874, compelling the Court to find a Fourteenth Amendment violation.

Defendants further argue that their failure to retrofit the jail does not evince deliberate indifference where the cost of a structural upgrade would exceed $33 million,[10] and where they have taken steps to replace the facility altogether, including two unsuccessful efforts to gain voter approval to issue bonds. Yet the City chose the one type of measure, a referendum, that required approval of two-thirds of the voters; neither a general obligation bond nor a certificate of participation would require a two-thirds majority for passage. (Findings at 183–84.) Even without voter approval, the City had almost $11 million allocated for seismic repairs to Jail No. 3 in 1995, but it ultimately diverted that money to other projects. (Findings at 169, n. 183.) These facts, among

---

9. Defendants rely on *Ruiz v. Estelle,* 679 F.2d 1115, 1153, *amended in part, vacated in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983), in which a circuit court denied relief to inmates in a facility with fire exits that did not meet code. (*See* Defs.' Opp'n to Rule 52(a) Mot. at 12.) The risks of fire in Jail No. 3 appear far more palpable, and more remediable, than the problems of the narrow fire exits presented in *Ruiz.* Moreover, this Court must decide this case under the

standard imposed by the more protective Fourteenth Amendment, not the Eighth Amendment, which applied in *Ruiz.*

10. In a similar challenge by inmates against the City, the Ninth Circuit held that "financial constraints do not allow [municipalities] to deprive persons of their constitutional rights." *Stone v. City & County of San Francisco,* 968 F.2d 850, 858 (9th Cir.1992) (citations omitted).

**910**

others, led the Special Master to recognize that the City did not seriously consider ameliorating conditions at Jail No. 3. (*Id.* at 184.) No evidence exists that defendants made any other efforts to fund seismic repairs. (*Id.*) In short, defendants have shown deliberate indifference.

Plaintiffs have a constitutional right to reasonable safety from harm. *See Helling,* 509 U.S. at 33, 113 S.Ct. at 2480–81 (interpreting the Eighth Amendment). Defendants may determine the most economical method for attaining seismic safety, whether that involves minor repairs, retrofitting, or replacement of the entire structure. In any case, their failure to ensure plaintiffs' reasonable safety violates the Fourteenth Amendment.

### 4. Water, Plumbing, and Sewage.

■ Physical defects in the jail's water, plumbing, and sewage systems also create safety hazards. The Special Master has found that the antiquated water supply system "violates public health requirements and safe drinking water codes," and defendants have made no attempt to have the system properly inspected. (Supp. Report at 165.) Defendants respond that they plan to fix the roof of the water tank and rebuild water pumps, (see LaVigne Decl. ¶ 14), but those efforts obviously would not remedy all of the problems with defendants' water quality testing and treatment.

As for plumbing, the Special Master found sanitary fixtures so deteriorated that they pose a public health hazard; unsealed floors with water leaking from floor to floor; hot water pipes with deteriorated asbestos insulation; and an absence of vacuum breakers in many places that would prevent contaminated water from being drawn into the potable water supply. (Supp. Report at 164.) The City's own Department of Public Health has cited other health hazards as well. (*Id.*)

Although defendants have made some attempts to improve problems with sewage treatment at the jail, critical deficiencies remain. (Supp. Report at 165–66) Sewage leaks from pumping equipment in the sub-

basement. Open cisterns provide breeding sources for mosquitoes, posing health risks due to defendants' failure to install screened windows in the kitchen, health center, and sleeping areas of the jail.[11] (*Id.* at 166.) Along with other problems in sewage treatment, the Special Master found the system replete with "flagrant violations of reasonable public health standards." (*Id.*)

■■ Such conditions as poor plumbing and sewage systems rise to the level of a constitutional violation where they appear "in such disrepair as to deprive inmates of basic elements of hygiene and seriously threaten their physical and mental well-being." *Hoptowit,* 753 F.2d at 783. Defendants make much of the lack of any evidence of disease resulting from any of these deficiencies. The Supreme Court does not require plaintiffs to produce such evidence; as the Court noted in *Helling,* "a [judicial] remedy for unsafe conditions need not await a tragic event." 509 U.S. at 33, 113 S.Ct. at 2481 (opining that inmates may "successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery"). *Id.* Accordingly, the Court grants summary judgment for plaintiffs as to these issues.

### 5. Hygiene Relating to Food Preparation and Storage.

■ Interpreting the Eighth Amendment, the Tenth Circuit has held that inmates have a constitutional right to food "served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm,* 639 F.2d 559, 570–71 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). In this case, the Special Master found repeated violations of standards of hygiene in food preparation areas, such as the kitchen and storeroom. (Supp. Report at 177.) Inadequate and damaged kitchen facilities result in various hazards. Food preparers must use the same sink for washing hands and to prepare food. (*Id.* at 154.) Provision of hot water appears inadequate for cleaning purposes;

**11.** New sewage pumps and valves were ordered to address the leak, but were not installed by the close of the record.

final sanitizing rise temperature averaged 140 degrees, 40 degrees below the temperature required by applicable standards. (*Id.*) Water leaks in the storeroom from overhead pipes on to stored food. (*Id.* at 156.) Food trays were washed but not properly cleaned, and food was served at improper temperatures, all increasing the risk of contamination. (*Id.*)

Despite these continuing problems, defendants have made significant improvements in recent months. To combat vermin infestations, they have installed a regular extermination schedule to address problems with rodents and insects, and have recently required the immediate disposal of unused food. (Supp. Report at 140–41.) These efforts have reduced the number of rodents and insects in the kitchen. (*Id.*) Defendants have also allocated $100,000 to replace the crumbling floor, repair the walls, install a sink, and upgrade kitchen appliances, although they had not yet implemented the improvements by the date of the issuance of the Supplemental Report. (*Id.* at 154.)

While conditions remain inadequate, the Court cannot say that defendants have acted with deliberate indifference in this area. Defendants' recent expenditures, combined with their efforts to combat vermin infestation, persuade the Court to grant summary judgment in defendants' favor.

### 6. *Safety Against Physical Violence.*

 The Special Master has identified a host of inadequacies in the jail's structure and administration that might contribute to the rate of violence within it.[12] The jail's

architecture stands prominently among these defects; a jail designed to house petty thieves and drunks will not accommodate maximum-security pretrial felons with histories of violence, escape, and gang activity. (*See* Supp. Report at 135–36.) The excessive length of the tiers and their numerous sight obstructions inhibit the detection of malfeasance.[13] (Findings at 36–37.) Staff within the jail admit that an inadequate number of deputies supervise the population, and some areas of the jail, including the tiers, lack any deputy supervision at all. (*Id.* at 91; Supp. Report at 91–93.) Inadequate surveillance and emergency systems also plague the jail. (Findings at 161.) Even with a reduction in jail population, levels of violence have not changed appreciably.[14]

The defendants have attempted to reduce violence in one significant way: they have revised the system for classifying inmates to segregate them in a manner that will minimize the potential for violence. (*See* Supp. Report at 84–85.) Due to the lack of records and other sources of data, however, the Special Master could not evaluate the effectiveness of the new system. (*Id.*)

Jail No. 3 suffers from defects that may create or contribute to abnormally high levels of violence. Nothing in the record, however, indicates that violence within Jail No. 3 is indeed abnormally prevalent. Defendants' operation logs reveal that 138 violent incidents occurred in the first 10 months of 1995, and 96 over the same period in 1996.[15] (Supp. Report at 90.) The logs reveal that most of the incidents involved one-on-one fights among inmates, with few instances of

---

12. Defendants object to those portions of the Findings that relate to the safety of the correctional and civilian staff. (*See* Pl.'s Mem. P. & A. at 42.) The Court sustains those objections, because plaintiffs lack standing to complain on behalf of the staff.

13. High levels of noise also prevent deputies from hearing inmates' calls for help. (Supp. Report, Ex. 1 at 25.)

14. Approximately .20 violent incidents occurred per inmate-year in 1995, according to defendants' operation logs, and .19 incidents per inmate-year in 1996. Defendants object to the

Special Master's reliance on these statistics, because the absolute numbers of violent incidents declined between 1996 and 1995, due largely to the reduction in jail population. (*See* Defs.' Mem. of P. & A. to Correct Supp. Report at 25–26.) The Court overrules this objection. The relevant question to any plaintiff confined at Jail No. 3 is his risk of suffering violent attack. Statistics relating to the rate of violence, rather than the aggregate number of violent incidents, properly captures this risk.

15. Reports transmitted to the central office suggest figures roughly 30 percent lower. (*See* Supp. Report at 90.)

multi-inmate violence.[16] (Supp. Report App. D.)

It is not self-evident that the occurrence of one fight every three days—in a facility housing 500 high-security pretrial felons—subjects inmates to an unconstitutionally high risk of violence. Housing hundreds of violent persons in close quarters will inevitably produce violence. *Cf. Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) (describing statistics on widespread violence in prisons throughout the nation). The Court needs a greater showing before finding a constitutional violation.

For instance, it would be particularly helpful to scrutinize rates of violence typically seen at institutions with populations of this type and size. *See Madrid v. Gomez,* 889 F.Supp. 1146, 1269 (N.D.Cal.1995), *mandamus denied,* 103 F.3d 828 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1823, 137 L.Ed.2d 1031 (1997). In Madrid, Chief Judge Henderson similarly declined to find that the levels of violence in Pelican Bay State Penitentiary violated the Eighth Amendment because plaintiffs "provided little evidence that the overall total number of cell fights ... is significantly more than would be expected for facilities of their size and security designation." *Id.* This reasoning applies with equal force here. One cannot discern whether Jail No. 3 exposes inmates to an unconstitutionally high level of risk of harm without some sense as to what an acceptable level of risk resembles.

The Court does not pretend to ignore the problems of cross-institutional comparisons. *Cf. Alberti,* 790 F.2d at 1226; *Doe v. District of Columbia,* 701 F.2d 948, 966 (D.C.Cir. 1983) (Separate Statement of Edwards, J.). Undoubtedly, in some cases, the sheer number or harrowing nature of reported assaults may appear so egregious as to compel a finding of unconstitutional conditions without the need for any comparisons, *see Murphy v. United States,* 653 F.2d 637, 642 (D.C.Cir. 1981), but this is not such a case.

### 7. Air Quality, Ventilation, and Heating.

"The lack of adequate ventilation and air flow undermines the health of inmates and the sanitation of the [institution]." *Hoptowit,* 753 F.2d at 784 (citation omitted) (finding violation under the Eighth Amendment's prohibition of cruel and unjust punishment), (citing *Ramos,* 639 F.2d at 569). The Ninth Circuit has also found that knowingly subjecting inmates to asbestos exposure violates their constitutional rights. *See Wallis v. Baldwin,* 70 F.3d 1074, 1077 (9th Cir.1995).

◼ At Jail No. 3, airborne environmental risks pose serious health risks to inmates. Although airflow within most of the cells appears adequate, numerous other problems abound. (Findings at 36.) No records of cleaning of 60–year–old air ducts appear to exist; asbestos appeared on steam pipes and elsewhere throughout the building; vapors from combustion gases emitted by a nearby portable boiler filled the health care center; and ventilation in the infirmary appeared "totally inadequate to meet health care standards." (*Id.* at 159–60.) Readings detect no air movement in the observation and safety cells, and the "intake chamber for the ventilation system has exposed asbestos over which the air circulates." (Supp. Report at 61.).

As for the heating, the Special Master found dozens of broken radiators and unit heaters, inadequate thermostats, and wide temperature fluctuations within the jail. (Findings at 159–60.) Heat and air quality problems appear exacerbated by the hundreds of broken windows in the jail, which the maintenance staff lacks the resources to replace. (Supp. Report at 157.) In many areas, broken panes and missing cranks prevent staff from opening and closing windows to regulate ventilation. (*Id.* at 176.) Defendants have applied heavy plastic to reduce the cold drafts and water penetration into the cells, but the heat buildup induces inmates to tear holes in the plastic for air, allowing the cold and moisture to return. (*Id.* at 157.)

---

**16.** Although some of the incidents resulted in physical harm, one cannot characterize all of the incidents as particularly violent. For instance, of the two reported incidents between April 1st and April 8th, one involved an inmate who "had coffee thrown on him," and another inmate had water and toilet paper thrown at him. (Supp. Rep.App. D. at 2.)

Since the issuance of the Supplemental Report, however, defendants have taken steps toward resolving these problems. They assert that they have encapsulated asbestos "in the ventilation system on the first floor, basement and penthouse fan room." (LaVigne Decl. ¶ 4.) From this statement, it does not appear clear whether defendants have remediated asbestos located elsewhere in the building, such as on the steam pipes. Nor do defendants appear to have had an asbestos expert inspect the building or approve it; had they done so, they might have discovered exposed asbestos in the kitchen, as the Special Master recently reported to the Court. (Conversation with Special Master May 22, 1997, regarding Asbestos Ten Laboratories, Inc.'s May 9, 1997 evaluation of material found by inmate.)

Defendants also allege that they have begun to test the use of plexiglass window covers on broken windows, that "[f]unding is available" for repairs in the heating system, and that parts "are on order" to improve the ventilation in the safety and observation cells. (*See* LaVigne Decl. ¶¶ 8–10.) Defendants argue that these efforts reveal the lack of deliberate indifference on their part, but the fact that none of the improvements has been implemented or verified raises significant questions of fact that the Court cannot resolve by summary adjudication.

8. *Medical and Psychiatric Treatment and Supervision.*

■ Courts typically find deliberate indifference to inmates' health needs where plaintiffs have shown "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff, or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos*, 639 F.2d at 575 (citations omitted). Since defendants' report of changed conditions, the Special Master has not found such a situation in Jail No. 3. The existing medical staff, which the Special Master characterized as "well-trained" and "dedicated," (Supp. Report at 130), appears "sufficient to meet the health care needs of the current prisoner population." (*Id.* at 117.)

Defendants filled vacant pharmacy staff positions, and increased the amount of psychiatric clinical services to 96 hours per week, thereby matching the level deemed adequate by the Special Master in an earlier report. (*Id.* at 129, Findings at 129.) Defendants solved problems relating to the jail's inadequate treatment of inmates with serious psychological problems by opening Jail No. 8, which has absorbed all such inmates, as well as those with more intractable physical ailments. (Supp. Report at 123.) Although medical staff continue to take x-rays without lead shields, defendants defend this practice as *acceptable under state regulations*, (*see* Goldenson Decl., filed June 14, 1996, 1 5), and the x-ray technician now brings a lead shield to use at the patient's request. (Supp. Report at 129.)

Despite the shortcomings of the physical plant, which remains seriously deteriorated and inadequate for the provision of medical services, (*id.* at 128), plaintiffs cannot show a pattern of negligent conduct or of systemic and gross deficiencies. *See Ramos*, 639 F.2d at 575. Accordingly, the Court grants summary judgment for defendants.

9. *Personal and Legal Visitation.*

The Special Master has found adequate the hours of personal and legal visitation, with infrequent interruptions in schedule. (Supp. Report at 190–91.) As to personal visitation generally and as to the hours and accessibility of legal visitation, the Court must grant summary adjudication for defendants.

■ Serious deficiencies remain, however, with regard to privacy in attorney-client consultations, due to the lack of space and the absence of sound barriers. (1995 Report at 190.) Inmates and counsel must whisper to communicate without unintended disclosure, yet due to the high noise levels, the intended listeners endure considerable difficulty in understanding the communication. (*Id.*) This raises Fourteenth and Sixth Amendment concerns insofar as it compromises counsel's ability to adequately prepare plaintiffs' defense. *See Johnson–El v. Schoemehl,* 878 F.2d 1043, 1052 (8th Cir.1989).

■ In their motion to correct, defendants counter that the Special Master's find-

ing of a lack of confidentiality is undermined by his earlier findings that they installed a video conferencing system for attorney-client communications in late 1995, and that the system appeared to operate smoothly.[17] (Mot. to Correct at 40, 53; *see also* Findings at 191.) The Supplemental Report does not disclose whether the video conferencing system permits confidential discussions, or whether a substantial number of inmates can easily utilize the system. Due to these factual questions, the Court cannot decide, as a matter of law, whether these conditions give rise to a constitutional violation.

### 10. *Legal Materials.*

■ The Special Master has found a sufficient number of books available for legal research, an accessible library staff, and adequate assistance from the staff attorney and student volunteers. (Supp. Report at 133.) The materials and assistance remain inadequate for non-English speakers, however, and some inmates appear · dissatisfied with their access to the law library. (*Id.* at 132–33.) Yet plaintiffs do not point to any inmate who has alleged that these inadequacies have actually "hindered his efforts to pursue a legal claim," as required by the Supreme Court's recent decision in *Lewis v. Casey,* — U.S. —, —, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996). Accordingly, the Court grants summary judgment for defendants.

### 11. *Religious Materials and Opportunity to Engage in Religious Worship.*

■ Defendants have provided a sufficient number of Korans and English and Spanish Bibles to inmates, but significant obstacles prevent the regular attendance of religious services at Jail No. 3. (Supp. Rep. at 193–94.) Plaintiffs can attend a religious service only every other week, and access appears completely barred for inmates in administrative segregation. (*Id.* at 194.) The Special Master also found administratively-imposed interruptions in services, and no provision of confidential areas for religious counseling. (Findings at 194–96.) The Special Master explains that "custody and space reasons" underlie these restrictions. (Supp. Rep. at 194.) Although religious volunteers at Jail No. 3 all agree that "the jail administration tries to accommodate religious meetings in the jail," the jail lacks space to hold a large congregate service, and interruptions are often created by the movement of prisoners necessary to secure the jail for visitors. (Findings at 192, 195.)

Whether these restrictions constitute "punishment" for the purposes of Fourteenth Amendment jurisprudence requires some analysis of the scope of plaintiffs' First Amendment rights, because the deprivation of a nonexistent right cannot amount to punishment. The Supreme Court recently overturned the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.* in *City of Boerne v. P.F. Flores, Archbishop of San Antonio,* — U.S. —, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), compelling this Court to analyze the question through the lens of pre-RFRA constitutional jurisprudence. Under the pre-RFRA standard, prison regulations limiting inmates' free religious

---

**17.** Defendants also argue that no facts indicate that any particular inmate's rights to counsel or to due process materially suffered from the current conditions. Plaintiffs need not show actual harm to state a constitutional violation where harm appears imminent. *Cf. Lewis, supra* n. 5, — U.S. at —, 116 S.Ct. at 2179 (requiring a showing of "actual or imminent harm" to state a claim for denial of an inmate's right of access to the courts). Here, imminent harm appears likely where any inmate "might be hesitant to disclose names and information relevant to [his or her] attorney's investigation and necessary to the advice sought." *Johnson–El,* 878 F.2d at 1052. For example, in offering exculpatory evidence to his attorney, a pretrial detainee might need to implicate a fellow inmate, or a close associate of

an inmate, in the commission of the offense for which the detainee has been charged. Without an assurance of confidentiality, fear or retribution chills such communication.

Even if, under *Lewis,* the Court found that the jail's inadequacies do not hinder plaintiffs' access to the Courts, their Sixth Amendment right to effective assistance of counsel suffers direct assault with the absence of confidentiality. "[A]n accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him." *Mastrian v. McManus,* 554 F.2d 813, 820–21 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977) (quoting *Coplon v. United States,* 191 F.2d 749, 757 (D.C.Cir.1951) (citations omitted)).

exercise did not violate the First Amendment so long as they appeared reasonably related to a legitimate peneological interest.[18] *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987).

▬ Under *Turner*, the Court must consider four factors in deciding whether the restrictions meet rational basis scrutiny: (1) whether the restrictions have a logical connection to the legitimate government interests, (2) whether alternative means of religious expression remain open to inmates, (3) the likely impact of accommodating the inmates' asserted right on guards, other inmates, and the general allocation of jail resources, and (4) the existence of ready alternatives to the existing policy. *See Turner*, 482 U.S. at 89–91, 107 S.Ct. at 2261–63. In this case, the jail simply lacks space for large religious services, so defendants regulate attendance by permitting participation of the north- and south-side inmates on alternate weeks. Interruptions in services, even if excessive, are caused by defendants' need to move prisoners in a timely manner. The inability of administratively-segregated inmates to attend services presumably stems from safety considerations. Thus, under the first prong of the *Turner* analysis, the limitations on plaintiffs' attendance at services appear logically related to defendants' legitimate concerns in safety and orderly administration of the jail.

As for the second factor, concerning the availability of alternative means of religious expression, the Supreme Court looks most closely at whether the policy denies inmates all forms of religious exercise. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351–52, 107 S.Ct. 2400, 2405–06, 96 L.Ed.2d 282 (1987) Here, defendants have not wholly barred plaintiffs from participating in religious services, but merely have restricted the frequency of attendance, so this factor also favors defendants.

Although the Special Master has made no findings with regard to the impact of any accommodation, such findings appear unnecessary in light of plaintiffs' failure to point to any "ready alternative" that could be implemented with *de minimis* cost to defendants. *Cf. Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262–63. In short, the Court finds no breach of plaintiffs' First Amendment rights sufficient to give rise to a finding of "punishment" under the Fourteenth Amendment.

### 12. *Noise.*

▬ Noise levels exceed acceptable levels in the jail, ranging between 73 and 96 decibels. (Supp. Report at 58.) Annoyance and more troubling psychological harm can result from living in an environment in which the average noise level remains constantly louder than a ringing alarm clock at a distance of two feet from the listener. (*See* Findings, Ex. 1 at 25.) More important, safety concerns arise as well; officers on some tiers cannot hear inmates' calls for help, and must rely on other inmates to inform them of emergencies. (*Id.*)

Defendants have made efforts to reduce the noise on the tiers. They have placed the level of volume on the television sets in the control of the deputies, equipped security radios with earphones, and increased the presence of deputies on the tiers. (Supp. Report at 57–58.) Nonetheless, the extent to which noise continues to exceed maximum standards—typically 70 decibels—suggests that these efforts are merely cosmetic, and that far more can be done. The Court grants summary judgment for plaintiffs.

### 13. *Lighting.*

▬ Applicable code requirements and correctional standards mandate lighting of at least 20 foot-candles in living areas, and some health standards require 30 foot-candles. (*See* Pls.' Mem. P. & A. at 17.) Readings in Jail No. 3 ranged from .28 to 5 foot-candles, drastically below accepted standards. (Findings at 35.) Defendants allocated $140,000 to the improvement of light in the jail, but implementation has not yet occurred. (Supp. Report 60.)

---

**18.** Although the *Turner* court addressed the rights of convicted inmates, the Ninth Circuit has extended the application of the *Turner* standard to the claims of pretrial detainees. *See Friend v. Kolodzieczak*, 923 F.2d 126, 127 (9th Cir.1991).

Where lighting appears so poor as to be inadequate for reading and to cause eyestrain and fatigue, the conditions appear unconstitutional even under the Eighth Amendment. *Hoptowit,* 753 F.2d at 783. Poor lighting also impairs the vision of guards, critical to adequate surveillance and safety. Here, the threat to plaintiffs' health and safety appears sufficient to constitute punishment.

### 14. *Outdoor Recreation.*

■ Defendants have demonstrated substantial improvements in the provision of outdoor recreation to inmates, now offering approximately six hours of exercise out-of-doors per week. (Supp. Report at 96.) Defendants have even hired a recreation coach at the jail to ensure safe and healthy exercise habits. (*Id.* at 97.) Although clothing remains inadequate for cold weather exercise, the shortage typically does not prevent inmates from using the yard. (*Id.* at 96.) The Court finds no constitutional violation here.

### D.

■ Although the Court has broad equitable powers to fashion relief in this case, *see Stone,* 968 F.2d at 861, it remains mindful that it should craft the remedy narrowly, such that the injunction " 'does no more and no less than correct [the] particular constitutional violation.' " *Doty v. County of Lassen,*

37 F.3d 540, 543 (9th Cir.1994) (quoting *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982)). To properly strike a balance between remedying the constitutional violation and minimizing judicial intrusion into jail management, courts typically require the development and implementation of a narrowly tailored remedial plan. *See Madrid,* 889 F.Supp. at 1280 (citing cases).

■ That remedy appears appropriate in this case. Defendants have a set of discrete issues to confront with their remedial plan, consisting of each of the conditions that the Court has found unconstitutional: fire safety, seismic safety, water, plumbing, sewage, noise, and lighting. To this list, the Court adds overcrowding. Although current population levels work no constitutional harm, the Court has found that the overcrowding that existed for many years until 1996 amounted to punishment. In his Supplemental Report, the Special Master concluded that defendants will likely increase the jail's population in the near future, and although defendants dispute that assertion, a "cognizable danger of recurrent violation" clearly exists in this case to warrant injunctive relief.[19] *See United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). "[T]he court's power to grant injunctive relief survives dis-

---

[19] The Special Master observed that a number of factors make it likely that the population of Jail No. 3 will increase, forcing defendants to resume the practice of double-celling. Those factors include the already full utilization of Jail No. 8 and other jails in the system, the systemwide increase in bookings, a lack of funds for diversionary programs, and a lack of any written, formal commitment by defendants to limit jail population. (Supp. Report at 19–25.) Defendants object, arguing that Jail No. 1 remains under capacity, that the Sheriff has orally directed that population at the jail not exceed 557, that booking information provides an unreliable basis for projecting future jail populations, and that the Justice Department recently granted the City $1.2 million in additional funds for diversionary programs. (*See* Defs.' Supp. Mem. in Support of Mot. Under Rule 53(e) at 6–12.)

The Court does not find the Special Master's findings to be clearly erroneous. To avoid the issuance of injunctive relief in this case, defendants bear the burden of establishing that the wrongs of the past will not recur. *See Farmer,*

511 U.S. at 846 n. 9, 114 S.Ct. at 1984 n. 9 (holding that prison officials could prevent the issuance of an injunction "by proving ... that they were no longer unreasonably disregarding an objectively intolerable risk of harm *and that they would not revert to their obduracy upon cessation of litigation*") (Emphasis added.) They have not done so here. Even if defendants have shown that booking rates appear imperfectly correlated with jail population, common sense dictates that some causal relationship exists. To demonstrate otherwise would require some econometric or other statistical analysis to isolate the effect of booking rates from that of numerous other variables affecting the systemwide jail population, and defendants offer none. Nor do defendants point to any written policy that they have issued that clearly limits the jail's population; they merely cite the Sheriff's oral instructions, which are easily revocable. Finally, even with defendants' assertion that they operated Jail No.1 at only 80 percent capacity, it hardly amounts to clear error to suspect that a small increase in systemwide population could quickly fill that jail's 85 open beds.

continuance of the illegal conduct." *Id.* (citations omitted); *see also Quern v. Mandley,* 436 U.S. 725, 733–34 n. 7, 98 S.Ct. 2068, 2073–74 n. 7, 56 L.Ed.2d 658 (1978) (finding no procedural error in an appeals court's direction of an entry of judgment enjoining a state's operation of a program that the state had discontinued long before). Here, defendants must provide a remedial plan that ensures that they will not return to their practice of corralling two adults into the same 41–square–foot space.

As for those issues not resolved by summary judgment—personal safety from violence, air quality, ventilation, heating, and confidentiality of legal visitation—counsel shall meet and confer to determine the most economical manner of proceeding. The parties could save City taxpayers the additional burden of extending this litigation by simply settling those remaining issues within defendants' submission of a remedial plan.[20]

### III.

Accordingly,

IT IS HEREBY ORDERED that:

1. Pursuant to Rule 53(e)(2) of the Federal Rules of Civil Procedure, the Court adopts the Special Master's Supplemental Findings of Fact as submitted, with the exception of those objections that the Court has sustained, as described in this Opinion and Order.

2. The Court grants plaintiffs' motion for summary judgment, and denies defendants' motion, as to the following conditions of detention: (a) fire safety, (b) seismic safety, (c) water, plumbing, and sewage, (d) noise, and (e) lighting.

3. The Court grants defendants' motion for summary judgment, and denies plaintiffs' motion, as to the following conditions of detention: (a) overcrowding, (b) hygiene relating to food preparation and storage, (c) medical and psychiatric treatment and supervision, (d) personal and legal visitation,

excluding questions of confidentiality, (e) legal materials, (f) religious materials and services, and (g) outdoor recreation.

4. The Court denies defendants' and plaintiffs' motions as to the following conditions of detention: (a) personal safety from violence, (b) air quality, ventilation, and heating, and (c) confidentiality of legal visitation.

5. On or before September 12, 1997, the City shall submit to the Court a detailed plan for resolving the constitutional defects described in this Opinion and Order, including those relating to (a) fire safety; (b) seismic safety, (c) water, plumbing, and sewage, (d) opportunity to engage in religious services, (e) noise, (f) lighting, and (g) potential recurrence of overcrowding.

6. The parties shall swiftly proceed to resolve the remaining issues, as well as the claims of the named plaintiffs, by settlement or trial. Plaintiffs shall make Sedgwick McNeely available to defendants for deposition.

---

20. If the parties cannot settle, alternatives short of trial exist. For example, the Court could resolve the remaining issues by an additional summary judgment ruling. Each of these issues appears amenable to rapid resolution after brief additional discovery, followed by the submission of a joint statement of undisputed facts. For instance, counsel could agree upon a single asbestos inspector who could determine whether the present conditions pose a health threat, and the report of that inspector could constitute part of the joint statement of the parties.